[Crim. No. 6642. Third Dist. June 25, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
CLARENCE OTIS SMITH, Defendant and Appellant.

**COUNSEL**

Clarence Otis Smith, in pro. per., and Robert Carl Anderson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E James, Assistant Attorney General, Arnold O. Overoye and Robert D. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRIEDMAN, J.**—On the night of July 12, 1971, an unknown assailant entered the Dog Bar campground, located on the Bear River in Nevada County. He entered the tent of Mr. and Mrs. Kenneth Garbe, attacked them, pursued them outside, then attacked other campers, hacking and stabbing with a curved knife which witnesses compared to a sickle. When the episode had run its course, two campers were seriously wounded and two were dead. The assailant disappeared.

Ultimately, defendant Clarence Otis Smith was identified as the attacker. He lived approximately two miles from the Dog Bar campground by road and about one and one-tenth miles cross-country. Tinted prescription eyeglasses (bearing bloodstains and with a cracked lens) belonging to him were found at the Dog Bar campground. In a sump behind his house officers found a curved knife resembling the death weapon and a .41 caliber Reuger pistol which had belonged to John Simmons, one of the dead victims. During the two days preceding the attack defendant had displayed such a curved knife to friends and acquaintances. Kenneth Garbe, a wounded camper, identified defendant as the assailant.

A jury trial resulted in verdicts finding defendant guilty of assault upon Kenneth Garbe by means of force likely to produce great bodily injury; of the second degree murder of John Simmons; of assault upon Marie Parker with intent to commit murder; of first degree murder of Donna Fitzhugh. He had pleaded not guilty by reason of insanity and the insanity issue was tried before the same jury which had passed upon his guilt. The jury found him sane. The trial judge imposed four consecutive sentences including a life sentence on the first degree murder count.[1] Defendant appeals.

In January 1971 Everett Richardson, a preacher ordained via mail order, moved in with the Smith family. The household consisted of Smith, his wife, and their children. Smith convinced Richardson that the house was occupied by demons. The group indulged in prayer and fasting in an attempt to exorcise these demons. On July 2, 1971, defendant threat-

---

[1]Penal Code section 190 expressly fixes life imprisonment as the punishment for first degree murder. In imposing four consecutive sentences the trial judge was apparently unaware of Penal Code section 669, which declares that "if the punishment for [one of several crimes] is expressly prescribed to be life imprisonment . . . then the terms of imprisonment on the other convictions . . . shall be merged and run concurrently with such life term." In view of section 669, the consecutive sentencing was error. Defense counsel objected to the trial court's imposition of consecutive sentences but did not call section 669 to the court's attention.

ened to kill Richardson, Mrs. Smith and the children unless they left immediately. They left and moved into a Sacramento motel, leaving defendant alone in the house. Richardson and Mrs. Smith ran out of funds, returned to the Smith residence and took some tools. Returning to Sacramento, they exchanged or sold the tools for food and rent.

On Saturday morning, July 10, defendant spent some time with Carl Stevens. He exhibited dislike of hippies and long-haired persons, stating that some hippies had stolen some of his tools. He told Stevens that he was going down to the [Bear] river and take revenge on the people that had stolen his stuff. He invited Stevens to go along, stating that he would supply a weapon for Stevens. He showed Stevens a curved knife which he intended to use.

The next morning, July 11, three men stopped at defendant's residence to investigate a yard sale. During their visit defendant consumed several large glasses of whiskey, becoming increasingly intoxicated. He said that some hippies had been stealing stuff from him and that he wanted to "overhaul" some of them and "work them over." Toward the end of the visit defendant became "real bad drunk" and said that he could cut somebody's throat. He displayed a long knife (which had the same appearance as the knife later found in his sump). When one of the visitors said, "God damn, that's a beautiful knife," defendant threatened him with the knife, telling him never to use the Lord's name in vain.

On July 12 (the day of the attack at the Dog Bar campground) Mrs. Smith, Richardson and the children returned to the house. They observed that defendant was wearing spectacles which were unbroken. When they arrived defendant was in "a fairly glad mood." Defendant and Richardson then engaged in some drinking. Defendant then displayed a knife (which Richardson identified as the same knife which the officers later found in defendant's sump). The knife had a taped handle. Richardson himself had made the knife in 1969. Defendant then threatened to kill Richardson, Mrs. Smith and the children and they left.

On the evening of the attack Mr. and Mrs. Garbe were in their tent at the Dog Bar campground, playing cards by the flickering light of a lantern. A strange man entered the tent, greeted them and reached for Mrs. Garbe with his hands. Kenneth Garbe saw that the man had a knife; he told his wife to get out and go to the next tent for help. Mrs. Garbe slipped underneath the side of the tent and went to the Fitzhugh tent nearby. She told Marie Parker and Donna Fitzhugh what was happening and went inside their tent and hid. She heard weird growling sounds and yelling outside.

Kenneth Garbe tussled with the man, who inflicted numerous knife wounds on him. Garbe broke away and ran toward some nearby campers, seeking help. Receiving no affirmative response, he returned toward the Fitzhugh tent.

John Simmons, a neighboring camper, came toward the Fitzhugh tent. Simmons was wearing a .41 Reuger pistol in a holster tied to his leg. The assailant approached him, knife in hand. Simmons pulled out his pistol; he and the attacker started to wrestle. Simmons fired one shot from his pistol and the man then stabbed him in the stomach with his knife.

Donna Fitzhugh and Marie Parker went to their tent and brought out a .22 rifle, but neither was able to fire it. Kenneth Garbe took the rifle and attempted to fire at the assailant, but the gun misfired. Mr. and Mrs. Garbe then attempted to get all nearby campers to flee across the river. Although Marie Parker and Donna Fitzhugh had commenced to leave the scene, they returned toward their tent, fearful for their children who were inside. Mrs. Parker was near the Fitzhugh tent when the assailant attacked her with his knife. He stabbed her in the side; he inflicted serious wounds on her head, neck and ear, broke her jaw and knocked out several of her teeth. The man then attacked Donna Fitzhugh, inflicting multiple wounds on her head, face and neck and stabbing her fatally in the chest area.

The attack on Simmons had taken place approximately 30 feet away from the Fitzhugh tent. The assailant traversed the 30-foot distance in order to attack Mrs. Parker. Mrs. Fitzhugh's body was found 50 feet from the point of the attack on Mrs. Parker and 80 feet from Simmons' body.

The next morning, July 13, Richardson telephoned defendant from Auburn. Defendant asked Richardson to pray for him, saying that he was "cut." Richardson and Mrs. Smith drove to defendant's house. Richardson noticed that defendant had a cut on his hand, his leg was bandaged and he was limping noticeably. Defendant was not wearing his glasses and told Richardson that he had lost them.

Dr. Stroud, a psychiatrist, had examined defendant under a court appointment. Dr. Stroud testified to his opinion that defendant was functioning under a degree of diminished capacity at the time of the attack, but he still had the mental capacity to form the specific intent to kill, to deliberate and premeditate, to harbor malice and to reflect meaningfully and maturely on the gravity of his acts. Dr. Stroud also expressed the opinion that defendant was not completely truthful as to "touchy" or

critical matters; he believed that defendant possessed a recollection of the events before, during and after the incident at the campground. He stated that a factor bearing upon his opinion of defendant's mental capacity was that the attacker fought as an active man, moved with rapidity and agility from place to place, wielding a weapon in a coordinated fashion, then disappearing from the scene.

The defense produced evidence that at the time of the crime defendant had been distraught by religious fervor aroused by Richardson; that his agitation had been augmented by a dalliance between Richardson and defendant's wife; that it had been intensified by the recent death of his young son in a truck accident for which defendant blamed himself; that he had been drinking heavily for several days before the attack on the Dog Bar campground; that he had displayed irrationality and aggressiveness during this period. Dr. Blinder, a psychiatrist,[2] testified that at the time of the events defendant suffered from substantial mental impairment; that he was incapable of formulating an intent to commit the attacks and that by reason of mental impairment he was unable to harbor malice and unable to premeditate; that he had suffered a memory loss due to one of these factors—alcohol poisoning, psychosis or the experience of an event so inacceptable that he had repressed it. On the foundation of this evidence the court instructed the jury on the diminished capacity doctrine, modeling its instruction on the prototype suggested by the California Supreme Court in *People* v. *Conley,* 64 Cal.2d 310, 324-326 [49 Cal. Rptr. 815, 411 P.2d 911].

### I

Preliminarily, we dispose of the claim that evidence of defendant's identity was inconclusive and insubstantial. The test on appeal, of course, is whether the finding of identity is supported by substantial evidence, including inferences reasonably deduced from the facts in evidence. (*People* v. *Mosher,* 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) Defendant's spectacles were found at the campground,

---

[2]Notably, both psychiatrists, Dr. Stroud and Dr. Blinder, were court-appointed and both were called as witnesses by the defense. It has been observed that many psychiatrists are adverse to diagnostic examinations under partisan auspices, preferring to testify after an examination pursuant to court appointment.

". . . more than ten per cent of psychiatrists refuse all courtroom employment and that another twenty per cent refuse employment as partisan experts—they are only willing to testify when cast in the role of neutral adviser to the court. One can, of course, simply assert that that still leaves seventy per cent of the nation's psychiatrists to draw upon and that that is more than enough. The truth of the matter is that in this dissenting third are to be found most of the leaders of American psychiatry." (Guttmacher, The Mind of the Murderer (1960) pp. 118-119.)

smeared with blood and with one lens cracked; the probable death knife and a pistol taken from one of the dead victims were found at defendant's home in a place indicative of concealment; he was identified in court by one of the victims, Kenneth Garbe;[3] finally, defendant himself bore minor lacerations seen by witnesses on several occasions after the attack. The evidence of defendant's identity was substantial.

 Defendant charges insufficiency of the evidence to support the finding that Donna Fitzhugh's murder was deliberate and premeditated. The contention must be appraised in the light of the defense of diminished capacity raised at the trial. Under the *Wells-Gorshen* rule, where intoxication or mental defect not amounting to insanity deprives the accused of the capacity to act with premeditation, he may be guilty of second degree murder but not of first degree (premeditated) murder. (*People v. Sirhan*, 7 Cal.3d 710, 726-727 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People v. Goedecke*, 65 Cal.2d 850, 855 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213]; see discussion in *People v. Hoxie*, 252 Cal. App.2d 901, 914-916 [61 Cal.Rptr. 37].)

Although defendant utilizes his evidentiary claim to seek unqualified reversal of the first degree murder conviction, an appellate court faces alternatives other than affirmance or reversal. In the absence of adequate evidence of premeditation, the reviewing court may exercise its power of modification to reduce a first degree murder judgment to second degree. (*People v. Anderson*, 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]; *People v. Bassett*, 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777]; *People v. Nicolaus*, 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]; *People v. Goedecke, supra,* 65 Cal.2d 850; *People v. Ford*, 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]; *People v. Wolff*, 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].)

We seek initially the scope of appellate review. A natural assumption is that review of evidence of premeditation is controlled by the conventional, substantial evidence test. Quoting from an earlier decision; *People v. Bassett, supra,* declares: ". . . [T]his court is empowered to modify the judgment and fix a lesser degree of the crime in those instances where *on an appraisal of all the evidence* there is found to be lacking any *sub-*

---

[3]Mr. Garbe's courtroom identification of defendant was somewhat weakened by an inaccurate description of the attacker he had given the police shortly after he had suffered knife wounds. At this point defendant seeks support in the rule which resolves conflicting circumstantial evidence in favor of the accused. That rule is designed for the jury and has no role in appellate factual review. (*People v. Daugherty*, 40 Cal.2d 876, 884 [256 P.2d 911].)

*stantial* evidence of the elements required to constitute the degree of the crime as fixed by the jury." (69 Cal.2d at pp. 137-138; italics in original.)

■ The ultimate standard under the substantial evidence rule is the reasonableness of the jury's determination. (*People* v. *Kunkin,* 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392].) Thus the *Bassett* opinion, 69 Cal.2d at page 139, declares: "[T]he appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt."

Other decisions of the state Supreme Court pursue a test not quite conforming to the conventionalities of the substantial evidence rule. In *People* v. *Holt,* 25 Cal.2d 59, 88 [153 P.2d 21], the court describes "the varying bases" which past decisions utilized for finding a lesser grade of crime. The *Holt* opinion refers to decisions grounding the power of downward modification on the appellate court's "doubt" as to the sufficiency of the evidence; it mentions decisions invoking the rule (generally applicable only to fact triers at the trial level) that of two equally reasonable constructions of circumstantial evidence, "the court [that is, the reviewing court] must adopt that theory pointing to guilt of the lesser degree." (25 Cal.2d at p. 88.) *Holt* suggests that some of the past pronouncements had been characterized by "imperfections of academic concept." (25 Cal.2d at p. 89.)

More recently, *People* v. *Anderson, supra,* 70 Cal.2d at page 25, quotes with approval the *Holt* opinion's reference to the "varying bases" of appellate review of murder verdicts. The *Anderson* and *Holt* opinions share a noteworthy characteristic—neither decision pays overt allegiance to the substantial evidence test. Like *Holt,* the *Anderson* opinion refers to plural "bases" of appellate factual review in dealing with first degree murder verdicts. (70 Cal.2d at p. 25.) Eventually, however, *Anderson* declares that "we find no evidence from which the jury could *reasonably* infer that defendant acted [with premeditation]." (70 Cal.2d at p. 30.) At this point, the *Anderson* opinion embraces the same test announced in our quotation from the *Bassett* opinion, *supra,* which is nothing other than a reformulation of the conventional substantial evidence rule.

■ Present decisional necessities demand an attempt to draw a consistent standard from *Bassett* and *Anderson.* In conventional appellate review the function "begins and ends" with the discovery of substantial evidence supporting the verdict. (*People* v. *Bassett, supra,* 69 Cal.2d at p. 138.) The task is relatively passive, relatively one-sided, fulfilled when the prosecution evidence turns out to be "reasonable in nature, credible,

and of solid value; . . ." (*Id.* at p. 139.) In the review of first degree murder verdicts (especially when featured by possibilities of diminished capacity) the substantial evidence formulation persists, but the appellate role is more intense, more active. Appellate duty is not satisfied, in the latter case, when substantial evidence emerges on one side. Rather, the judges must look to the evidence on both sides and not limit their scrutiny to that supporting the verdict. As *Bassett,* 69. Cal.2d at page 138, puts the matter, the reviewing court looks at "the entire picture of the defendant put before the jury . . . ." The appellate judges must examine the evidence for and against premeditation and weigh it in the balance. Their objective is not to replace the jury but to satisfy themselves that the verdict is reasonable. If it is it should stand, even though a verdict of lesser crime is equally reasonable. "This appraisal [of premeditated murder] is primarily a jury function and within a wide field of discretion its determination is final." (*People* v. *Holt, supra,* 25 Cal.2d at p. 90.)

When diminished capacity is in issue, an additional factor shaping appellate review is the presence or absence of psychiatric testimony. Defendant in this case leans heavily on *People* v. *Anderson, supra,* 70 Cal.2d at pages 26-27. *Anderson* describes the three categories of evidence bearing on premeditation and deliberation: (1) the defendant's "planning" activity before the killing; (2) his prior relationship with the victim as reflecting upon his motive; (3) the manner of the killing as it bears upon preexisting reflection to take the victim's life in a particular way. Defendant asks us to apply this three-prong test to the evidence, but at that point ignores the psychiatric testimony bearing upon premeditation and capacity to premeditate.

The *Anderson* opinion was framed without reference to psychiatric testimony of diminished capacity.[4] Thus the evidence of premeditation and malice was entirely circumstantial. In this context, the *Anderson* opinion tells reviewing courts that "in any case of circumstantial evidence" the court should inquire whether the evidence furnishes a reasonable inference of premeditation and deliberation or leaves these elements to conjecture and surmise. (70 Cal.2d at p. 25.) Here, where both expert testimony and circumstantial evidence bear upon the defendant's capacity to premeditate and harbor malice, we discern no mandate to consider anything but the entire body of evidence.

---

[4]Anderson's first trial, reversed on appeal, 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43], featured heavily conflicting psychiatric testimony. He was then retried. At a second trial the defendant put on no evidence and the prosecution apparently offered no psychiatric testimony. At any rate, the Supreme Court decision on the second appeal describes none. (See 70 Cal.2d at pp. 19-22.)

In appraising substantiality of the evidence, we bear in mind that the statutory definition of first degree murder as a "willful, deliberate, and premeditated killing" requires more reflection than that involved in the formation of a specific intent to kill. (*People* v. *Wolff, supra,* 61 Cal.2d at p. 821; *People* v. *Thomas,* 25 Cal.2d 880, 899-900 [156 P.2d 7].) The decisions employ a variety of verbal forms to describe as precisely as possible the requisite depth and extent of reflection. ▉ In order to justify a first degree murder verdict, the intent to kill must have been formed upon a *preexisting* reflection; it must have resulted from actual deliberation or *forethought;* the verdict is proper only if the slayer killed as a result of *careful thought* and *weighing of considerations.* The true test is not so much the duration of time as it is the extent of reflection. (*People* v. *Thomas, supra,* 25 Cal.2d at p. 900.) The brutality of a killing, the killer's indulgence in multiple acts of violence, are not enough to support a finding that he acted with premeditation and deliberation; the killing produced by an "explosion of violence" is more consistent with a lesser grade of homicide than premeditated murder. (*People* v. *Anderson, supra,* 70 Cal.2d at pp. 24-28.) In a general way, the foregoing are the concepts incorporated in the pattern instruction on premeditated murder published as CALJIC No. 8.20.[5]

▉ Defendant makes no attack on Dr. Stroud's qualifications or on the factual basis for his testimony. (Cf. *People* v. *Bassett, supra,* 69 Cal. 2d at pp. 141-144.) Although the psychiatric testimony on the score of diminished capacity was in sharp conflict, Dr. Stroud's opinion that defendant had the capacity to deliberate and premeditate was "reasonable in nature, credible, and of solid value." (*Id.* at p. 139.) Both the psychiatric testimony and the events give evidence of emotional disturbance exacerbated by drink. The very character of the events reveals impaired judgment and shallow motivation. As Dr. Stroud pointed out, such fac-

---

[5]Several decisions, notably *People* v. *Wolff, supra,* 61 Cal.2d 795, and *People* v. *Holt, supra,* 25 Cal.2d at page 89, call for an examination of the offender's *personal turpitude,* as revealed by the extent to which he could *maturely and·meaningfully* reflect upon the gravity of his contemplated deed. The editors of the standard instruction on premeditated· murder (CALJIC No. 8.20) have never embraced the *Wolff-Holt* terminology. In *People* v. *Sirhan, supra,* 7 Cal.3d at pages 727-728, the court quoted extensively from *Wolff,* but without asking whether the jury had been instructed in the language of *Wolff.* The California Supreme Court has never called for a jury instruction incorporating the *Wolff-Holt* nomenclature.

In the present case, the trial court utilized CALJIC No. 8.20 as the jury instruction defining deliberation and premeditation. In determining whether evidence of premeditation of any other element of a crime is substantial, appellate courts should apply a verbal criterion identical to that which controls the jury. We cannot look to theories not placed before the jury to determine the evidentiary justification for the jury's verdict. (*People* v. *Kunkin, supra,* 9 Cal.3d at p. 251.) We therefore avoid indulgence in the *Wolff-Holt* formula of premeditation.

tors affect the deliberative faculties only by degree.[6] ▮ Emotional disturbance, even borderline psychosis, does not exclude capacity to premeditate. (*People* v. *Sirhan, supra,* 7 Cal.3d at p. 728.)

So bizarre, so unprovoked and thinly motivated was the attack on the Dog Bar campers as to arouse skepticism that the death of a single victim, Mrs. Fitzhugh, was the product of preexisting reflection and deliberation. The skepticism dwindles when reflection and deliberation are viewed as elements in the attack on the entire group—which is to say that the at-

---

[6]We excerpt portions of the colloquy between Dr. Stroud and the district attorney:

"Q. Fine. We'll get to those in just a moment, Doctor. Did he have at that same time the mental capacity to deliberate?

"A. I would think yes. Again with the qualifications.

"Q. Did he have mental capacity to premeditate?

"A. I think so, yes.

"Q. Did he have the mental capacity to harbor malice?

"A. Yes.

"Q. And did he have the mental capacity to meaningfully and maturely reflect on the gravity of his acts?

"A. Yes.

"Q. You mentioned qualifications. Would you please qualify those answers, if this is—

"A. Yes, I'd be happy to. I think, ladies and gentlemen, what we get into, what the law says, and what—the way a psychiatrist thinks, and we see shades of gray. The law says a yes or no answer, as I see it. So that a medical man thinks more in terms of a gradual diminution, or gradual lessening of the capacity to think and to act sensibly; to know where you are, what you are doing, and whether it's hurting somebody or not. Now in Mr. Smith's instance we have I think a case that he is an intelligent man. I don't believe he has a continuous mental illness. But grant that he has had a deprived childhood; in and around the time that this crime occurred, he had suffered a tragedy; he was drinking too much; and that his wife and this young minister were in and out; that he was irritable; there is indications that he has ordered them out, or did order them out, and that he was to some degree disturbed . . . .

" . . . . . . . . . . . . . . . . . . .

"[DISTRICT ATTORNEY]: Q. Do you believe he was psychotic on July 12, 1971?

"A. No. But I would like to qualify that.

"Q. Please do.

"A. Again this phrase of diminished capacity comes in. He was not a totally normal person. I think he was disturbed. He was most probably intoxicated, and he was operating under stress, but I don't believe that he had an obliteration of consciousness such as he does not recall, or had no notion of what transpired.

"Q. Now you have told Mr. Schneider that you felt at the time of the commission of the alleged offense, Mr. Smith had the mental capacity to deliberate, and to premeditate, and to harbor malice. Would you kindly explain the basis for that conclusion?

"A. There are two or three instances of Mr. Smith mentioning to other people to get the hippies, to chase them out, or whatever. And I think that this shows some element of thinking about it ahead of time. And he even, I think, tried to enlist some people to go with him."

tacker planned to kill any group member he could catch. ■ In a case of multiple murders accomplished by an attack on spontaneously selected members of a group, the defendant's design to kill need not be directed at pre-selected individuals; it is enough that his premeditation be directed at the group. (See *People* v. *Sutic*, 41 Cal.2d 483, 491-492 [261 P.2d 241]; *People* v. *Aranda*, 12 Cal.2d 307, 310 [83 P.2d 928]; *People* v. *Stein*, 23 Cal.App. 108, 114-115 [137 P. 271].)

■ According to the evidence, defendant commenced thinking and talking about an attack on the Dog Bar campers as early as Saturday morning, July 10, two days before the attack. Then and later he displayed the weapon he intended to use. He sought to enlist others in his plan. He entered the tent of Mr. and Mrs. Garbe by stealth, knife in hand, immediately manifesting his program of indiscriminate attack. The knife he bore was seven inches long from haft to point, its blade curved and honed to a sharp edge and point, suitable for both cutting and stabbing. It is altogether illogical and unrealistic to infer that a surprise attack on strangers with such a weapon was intended only to wound and not to kill. It is more logical to infer that the assailant meant to inflict fatal wounds on indiscriminately selected members of the pre-selected group; that he failed as to some, succeeded as to others.

The evidence is indicative of a burst of frenzy immediately after John Simmons shot at defendant. Viewed in isolation, the attacks on Marie Parker and Donna Fitzhugh were savagely energetic, more consistent with the "explosion of violence" variety of second degree murder. Yet the jury could logically view these attacks as the culmination of a preconceived and designedly fatal attack on all campers within his reach. Indeed, the location of Mrs. Fitzhugh's body 50 feet from the point of attack on Marie Parker suggests that defendant purposefully pursued her in order to commit the fatal attack.

True, the jury found defendant guilty of second degree (unpremeditated) murder of John Simmons. This is not to say that the stabbing of Simmons would not have supported a finding of premeditated murder, based upon defendant's deliberate plan to kill any inhabitant of the camp within his reach.

Considering the trilogy of circumstances outlined in *People* v. *Anderson, supra,* we find heavy evidence of "planning" activity; shallow and distorted but, to the perpetrator, genuine motivation; a "manner" of killing consistent with a pattern of would-be fatal activity directed against the group to which the deceased belonged. Dr. Blinder, it is true, had testified that defendant lacked capacity to premeditate and to harbor mal-

ice. Evidence that defendant had actually planned his objective and then achieved it justified the jurors in accepting Dr. Stroud's opinion and rejecting Dr. Blinder's. In view of the circumstantial and psychiatric evidence, we have concluded that the jury's findings of capacity for—and actual—deliberation and premeditation in the killing of Donna Fitzhugh were reasonable and must stand.

## II

Defendant also attacks the first degree murder verdict for misdirection of the jury. As we have observed, the trial judge gave an instruction modeled after the "Conley" prototype, defining the various levels of homicide and describing the effect of diminished capacity attributable to mental defect and intoxication. One part of the prototype instruction reads: "Premeditation, deliberation, an intent to kill, and malice must be present for the killing to be first degree murder." (*People* v. *Conley, supra,* 64 Cal.2d at p. 325, fn. 4.)

As given by the trial judge, this portion of the instruction declared: "Premeditation, deliberation, or intent to kill, and malice must be present for the killing to be first degree murder."

Defendant assigns the last quoted declaration as error, and indeed it was. The erroneous substitution of the disjunctive "or" for the word "an" appears in documentary form in the clerk's transcript and in the transcription of the oral instructions. However inadvertent, the substitution conveyed an incorrect concept of the requisites for a first degree murder verdict. First degree murder, other than felony murder, calls for a twofold state of mind, consisting of malice aforethought and premeditation. (Pen. Code, §§ 188-189.) Viewed literally, the instruction permitted the interpretation that intent and malice formed an alternative to premeditation and deliberation as the state of mind underlying first degree murder. Such an alternative was no more demanding than the volitional requirement for a second degree murder verdict.

In the light of the record, the error was not prejudicial. In response to *People* v. *Conley, supra,* the trial judge's instruction included the standard instruction (CALJIC No. 8.20), which defines first degree murder as that perpetrated by "willful, deliberate and premeditated killing," formed "upon pre-existing reflection" but not that produced by an "unconsidered and rash impulse, even though it included an intent to kill . . . ." In the same instruction the court told the jurors that if the murder of John Simmons or Donna Fitzhugh was committed with malice and "willfully, deliberately and with premeditation," the murder was of the first degree,

while a reasonable doubt as to premeditation would call for a verdict of second degree murder. Because of the instruction's emphasis on premeditation and the state of mind implied by it, it was unlikely that the jurors extracted the incorrect statement and utilized it out of context as a basis for the first degree murder verdict. That the jury found defendant guilty of second degree murder in the death of John Simmons (the second victim and first fatality in chronological order) and first degree murder of Mrs. Fitzhugh (the fourth victim and second fatality) manifests their sensitivity to the difference between the two crimes. In the light of the record, there is no reasonable probability that the erroneous segment of the instruction prevented a more favorable verdict; hence it furnishes no ground for reversal. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 836-837 [299 P.2d 243].)

 Claiming evidentiary proof that he lacked mental capacity to harbor malice and to entertain a specific intent to kill, defendant charges insufficiency of the evidence to support the verdict of second degree murder resulting from the death of John Simmons and the verdict of assault with intent to commit murder based on the attack on Marie Parker. Penal Code section 188 defines malice as an essential element of murder other than felony murder: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

At this point defendant avoids the question whether there is substantial evidence to sustain the implied finding of undiminished capacity. In considering that question, we view the evidence in the light most favorable to the respondent and presume the existence of every fact the jury could reasonably deduce from the evidence. (*People* v. *Mosher, supra,* 1 Cal.3d at p. 395.) Our analysis of the evidence supporting the verdict of first degree murder of Donna Fitzhugh convinces us that there is substantial evidence of malice, express or implied, toward John Simmons and of a specific intent to murder Marie Parker.

In reference to the murder of John Simmons, an unspoken corollary of defendant's argument is that defendant lacked malice, having stabbed Simmons only in response to the latter's effort to shoot him. One who assails another and then brings on an attack may not claim self-defense as a ground of exemption from the consequences of killing his adversary. (*People* v. *Holt, supra,* 25 Cal.2d at p. 66.)

 Defendant charges that the court abused its discretion in ad-

mitting a colored photograph of Mr. Simmons' body and two colored photographs of Mrs. Fitzhugh's body. The trial court had discretion to determine whether the probative value of such exhibits outweighed their tendency to prejudice the jury against the accused. (*People* v. *Milan,* 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d 956].) The three photographs were taken at the scene of the crime; all are gruesome; their impact is heightened by vivid coloration; the two pictures of Mrs. Fitzhugh's semi-nude, terribly mutilated, bloody corpse have a sharp emotional effect, exciting a mixture of horror, pity and revulsion.

Not infrequently, evidentiary resort to such vivid horrors is rationalized by the statement that they tend to prove malice (e.g., *People* v. *Milan, supra; People* v. *Murphy,* 8 Cal.3d 349, 365 [105 Cal.Rptr. 138, 503 P.2d 594]) or that they are relevant in relation to aggravation of the crime and the penalty (*People* v. *Murphy, supra*). Such pictures are always offered as parts of an evidentiary mosaic; thus it is more appropriate to appraise their probative value as cumulative, not isolated, evidence. To say, moreover, that an exhibit bears upon aggravation of the penalty impliedly admits that it infuses the finding of guilt with the inadmissible element of moral condemnation. In this case there were ample descriptions of the positions and appearances of these two bodies. There was autopsy testimony regarding the precise location and nature of the wounds, which needed no clarification or amplification. (Cf. *People* v. *Murphy, supra*.) The record does not reveal what evidentiary purpose was expressed by the district attorney in presenting these pictures to the jury. The Attorney General points to no *added* probative value possessed by these exhibits. They supplied no more than a blatant appeal to the jury's emotions. Their prejudice-arousing effect heavily outweighed their probative value. The trial court erred in admitting them.

■ The error nevertheless did not cause a miscarriage of justice and furnishes no ground for reversal. At the guilt trial the jury heard testimony over a period of eight days. The trial transcript occupies more than 1,400 pages. Witnesses testified to defendant's activities before and after the crime, supplied narrative accounts of the attack, described the physical condition of the victims and the physical evidence connecting defendant to the crimes. In the face of the mass of evidence and the court's detailed instructions, there is no reasonable probability that these photographs swept the jury from rationality or induced any of the verdicts. Had the proof been thinner, the question of prejudice would possess more substance. Lack of actual prejudice and retention of discriminating judgment is also shown by the jurors' differentiation between the two killings and their choice to find defendant guilty of only second degree murder of John Simmons.

██ Error is assigned in the denial of a defense motion for new trial grounded on a claim of newly discovered evidence. The motion, of course, was addressed to the discretion of the trial court. Quite aside from the question whether the proffered testimony might produce a different result on retrial, the court had before it the question whether the defense had exercised reasonable diligence to discover and produce it at the trial.

A Mrs. Anderson was brought forward, who averred that she had seen a man she believed to be defendant on a bridge near the campground just before the attack with two other men, one of whom she now "felt" to be Richardson. Further, defendant's stepdaughter, Mrs. Plunkett, allegedly told an investigator that defendant and Richardson had jointly participated in killing a demon-possessed pet several months before the attack on the campers.

According to the record, Mrs. Anderson lived in the locality; the crime caused much conversation, and Mrs. Anderson freely discussed her encounter with the three men in conversations with persons in the neighborhood. If it occurred, the pet-killing episode was within defendant's knowledge. The court was justified in concluding that reasonable diligence would have made both pieces of evidence available in time for the trial.

### III

██ Finally, we consider defendant's charge of prejudicial misconduct by the district attorney at the insanity trial. The bifurcated guilt and insanity trials took place before the same jury. The parties stipulated that all evidence at the guilt trial could be considered on the insanity issue. The testimonial portion of the insanity trial consisted of the testimony of two psychiatrists, Dr. Rappaport, called by the defense, and Dr. Stroud, called by the prosecution. In effect, Dr. Rappaport stated that defendant was afflicted with paranoid schizophrenia at the time of the attack on the Dog Bar campers and unable to distinguish between right and wrong; that he was still actively psychotic and dangerous. Dr. Stroud expressed the opinion that defendant had been capable of knowing the nature and quality of his acts.

The alleged misconduct consists of the italicized segments of a portion of the district attorney's summation to the jury reproduced in the margin.[7]

---

[7]*"A finding of insanity would be a complete defense to the crimes Clarence Otis Smith has so far been convicted of. He would be found not guilty if he were found insane in the instance of each and every one of those things. It also would not be a finding of present insanity. Nothing you would do by your verdict would do anything except find him not guilty of the crime committed last July. It would not be a finding*

The defense made no objection, did not assign the statement as misconduct and sought no admonition.

As defendant contends, the italicized statements strongly imply that a finding of insanity would result in freeing the criminally insane and dangerous defendant. A number of California decisions hold that this kind of argument is prejudicial misconduct, because it misstates the law and because it conveys an inflammatory appeal to the jury to avoid exposing society to future danger.[8] ▋ Absence of an objection or admonition in the trial court will prevent the defendant from claiming prosecutorial misconduct on appeal except in two situations: first, where the case is closely balanced and the misconduct might have contributed materially to the verdict, and second, where the harm cannot be cured by a retraction or admonition. (*People* v. *Lyons,* 50 Cal.2d 245, 263 [324 P.2d 556].) ▋ Both exceptions seem to describe a single idea—despite absence of an objection, misconduct will cause reversal if it caused a miscarriage of justice, that is, if there is a reasonable probability that it shifted the verdict. We find no reasonable probability here. There are several reasons.

The psychiatric evidence on the sanity issue was closely balanced; the circumstances of the crime and the testimony of Dr. Rappaport and Dr. Blinder provided a substantial basis for a finding of insanity. These factors militate toward reversal. In the California decisions cited in footnote

---

*of present insanity*. Now I'm not going to make any kind of an emotional plea here to you, because first of all, I don't think that's necessary; I think it's a little old fashioned, and I think that we've been living with the facts of this case, as of today, for three working weeks, and it would be foolish of me to try to override your thinking processes by appeals to the heart. However, I do think it's not a bad idea to remember a few things. A feeling I expressed once before stays with me, is that I don't feel that this crime, bad as it was, is such a bad crime that it should excuse Clarence Otis Smith; such a bad crime that he can't be convicted of it. *I think we should recall Dr. Rappaport's words at this time. Clarence Otis Smith, he said, is still dangerous. We know he was dangerous July 11th. Dr. Rappaport says he's still dangerous. I really urge you not to let Mr. Smith evade the responsibility of his acts —again paraphrasing Dr. Rappaport—with knowingly destroying living individuals."* (Italics supplied.)

[8]*People* v. *Modesto*, 66 Cal.2d 695, 708-709 [59 Cal.Rptr. 124, 427 P.2d 788]; *People* v. *Sorenson*, 231 Cal.App.2d 88, 91-93 [41 Cal.Rptr. 657]; *People* v. *Castro*, 182 Cal.App.2d 255, 260-262 [5 Cal.Rptr. 906]; *People* v. *Johnson*, 178 Cal.App.2d 360, 372 [3 Cal.Rptr. 28]; *People* v. *Mallette*, 39 Cal.App.2d 294, 299-300 [102 P.2d 1084]. Contrary to the implication in the district attorney's argument, a defendant who is acquitted on the ground of insanity must be confined in an institution and not released without a judicial hearing and a finding of restored sanity. (Pen. Code, §§ 1026, 1026a.)

8, *supra,* this kind of misconduct aroused appellate fears that the illicit injection of the public safety element had inflamed the jury and caused it to ignore substantial evidence of the defendant's insanity. These fears stemmed from judicial assumptions concerning jury behavior. As in most other harmful-harmless error inquiries involving jury trials, these assumptions were quite subjective. They were drawn from the appellate judges' internal notions of human behavior or their individual reactions to personal experience as trial judges or lawyers.[9] *A priori* assumptions of this sort may do for want of anything better. They are at best uncertain and unreliable. Judges who believe that jurors are susceptible to inflammatory influences can be counter-balanced by those having better regard for the jury's collective stability and common sense. Judicial subjectivity on the score of jury behavior should be held in check when empirically grounded conclusions are at hand.

Only in recent years has a measure of relief from subjectivity become available. An empirical study of jury behavior in insanity trials is now available. The study (Simon, The Jury and the Defense of Insanity (1967)) is based upon data collected as part of the Jury Project of the University of Chicago Law School.[10] The Simon study of insanity trials utilized simulated conditions. Two actual trials featuring the insanity issue were recorded and condensed, then injected with variables consisting of different kinds of evidence and different jury instructions, then played out to juries drawn from actual jury pools in Chicago, St. Louis and Minneapolis. In

---

[9]The following excerpt from *People* v. *Mallette, supra,* 39 Cal.App.2d at pages 299-300, suffices as an example of the *a priori* appellate assumptions upon which such decisions turn: "The jury had just convicted her [the defendant] of murder. After said remarks [of the district attorney], they could not but have reasoned that if they found her insane they would turn loose upon the community a dangerous person capable of doing much mischief. The statement appealed to a deeply rooted sentiment and could not be erased by any admonition of the court. The instinctive reaction of a socially minded person to the picture of her 'walking out a free woman' is too well understood to require further elucidation."

This *ex cathedra* pronouncement in *Mallette* became the lineal ancestor of all the later California decisions in point, including our own holding in *People* v. *Sorenson, supra,* footnote 8.

[10]The project included studies of jury behavior under actual and simulated conditions and in both civil and criminal trials. The findings in criminal trials (not involving the insanity issue) were based on a sample of 3,576 actual jury trials in various parts of the United States and were published in Kalven and Zeisel, The American Jury (1966). The same publication, at pages 541-545, sets out a bibliography which includes several descriptions of the project. (See particularly Broeder, *The University of Chicago Jury Project* (1958) 38 Neb.L.Rev. 744; Kalven, *A Report on the Jury Project of the University of Chicago Law School* (1957) 24 Ins. Couns. J. 368; Meltzer, *A Projected Study of the Jury as a Working Institution* (1953) 287 Annals 97.)

general, each variant trial was played out to 20 to 30 juries, which then deliberated and came up with verdicts.[11]

Studies of this sort are often limited by time, staff and budget; their statistical base may not be wide enough for unconditional acceptance; validity of the models and of the statistical methods may be open to inquiry. Nevertheless, we find in the Simon study empirically supported conclusions which cast a shadow of skepticism over the *a priori* pronouncements in the California cases cited in footnote 8, *supra.*

Particularly pertinent here are the data measuring the juries' concern over the consequences of a verdict of not guilty by reason of insanity. In many jurisdictions including California commitment to a mental institution is an automatic result. (See fn. 8, *supra.*) An instruction might be appropriate informing the jury that an insanity verdict would result in a hospital commitment. (See *Taylor* v. *United States,* 222 F.2d 398, 404 [95 App. D.C. 373].) California law does not call for that sort of instruction.[12]

In the University of Chicago sampling of insanity trials, an automatic commitment instruction was given to 15 juries and withheld from 15. The ensuing mixtures of verdicts were almost identical; in each group of 15 there were 8 or 9 verdicts finding the defendant insane, 2 or 3 finding him sane and 4 featuring a hung jury. The author comments: "The results are conclusive. The presence or absence of commitment information had no noticeable effect on the individuals' or the juries' verdicts. . . . We can only conclude from the data that information as to disposition of the defendant is *not* a crucial consideration in the jury's decision. The results, however, are surprising and sharply contrary to the expectations of the bench and bar." (Simon, *op. cit.* pp. 92-93.)

As a means of checking the assumption that juries not receiving the commitment instruction would be ignorant of the consequences of an insanity verdict, the Chicago study asked the individual jurors (180 in each group) as to their expectations. Of the jurors who had received the commitment instruction, 167 (i.e., 93 percent) expected that a verdict

---

[11]The study discusses the variable caused by the jurors' awareness that their verdicts would have no practical effect. The author notes that the simulated juries became emotionally involved in their problem; that their deliberations were serious and extended. (Simon, *op. cit.* pp. 38-39.)

[12]*People* v. *Johnson, supra,* footnote 8, was one of the California cases reversing a sanity verdict for prosecution misconduct of the "turn him loose" variety. The leading opinion suggested that the misconduct could have been cured by an instruction as to the "true effect" of a finding of insanity. (178 Cal.App.2d at p. 372.) The suggestion has never been taken up.

of insanity would cause the defendant's commitment to a mental institution; of those who did not, 163 (91 percent) had precisely the same expectation. The data support the belief that without being told so, jurors are generally aware that a criminally insane person will be confined in a mental hospital until an authorized agency declares that he has recovered.

There is an independent reason for holding the misconduct harmless. Penal Code section 1026 permits the bifurcated guilt and insanity trials to be heard by the same or a different jury in the discretion of the court. Defendant's sanity trial took place before the same jury which had just found him in possession of the mental capacity for premeditated and deliberate killing. The jury was now being asked to decide whether, at the time of his attack on the campers, he had been legally insane according to the California variant of the M'Naughton standard, that is, whether he knew and understood the nature and quality of his act and knew and understood that his act was wrong. (*People* v. *Wolff, supra,* 61 Cal.2d at pp. 800-802.) The array of evidence at the guilt trial had moved the jury to reject the defense of mental illness depriving him of capacity to premeditate; the same evidence supplied a strong impetus for rejection of the insanity plea. It precluded any reasonable probability that the district attorney's impropriety influenced the jury's rejection of that plea.

The preceding conclusion has implications which need not be fully developed yet cannot be ignored. At the bifurcated guilt trial any evidence of mental pathology short of legal insanity is admissible to show lack of capacity. (*People* v. *Nicolaus, supra,* 65 Cal.2d at p. 881; *People* v. *Wells,* 33 Cal.2d 330, 347-349 [202 P.2d 53].) A jury which has just accepted or rejected that kind of evidence possesses preconceptions when it embarks upon the trial of the insanity issue. A claim of diminished capacity may be grounded on the cognitive factor (i.e., lack of awareness or consciousness) or on lack of volition, for example, irresistible impulse. (See *People* v. *Gorshen,* 51 Cal.2d 716, 726 [336 P.2d 492].) At the insanity trial the prevailing M'Naughton standard defines insanity in verbalisms primarily centering on the cognitive capacities. (See *People* v. *Wolff, supra,* 61 Cal.2d at pp. 800-802; Fingarette, The Meaning of Criminal Insanity (1972) pp. 144-152; Brady, *Abolish the Insanity Defense?—No!,* 8 Houston L.Rev. 629, 641-643; Diamond, *From M'Naghten to Currens, and Beyond* (1962) 50 Cal.L.Rev. 189.) When both claims rest on absence of cognitive capacity, both involve the jury in parallel and mutually interacting judgments. The two issues occupy overlapping conceptual territory, legal and medical. The extensive overlap has been noted: " '[The diminished capacity] rule would be largely coextensive with the [M'Nagh-

ten] right-and-wrong test, for a person who lacks the requisite criminal intent because of mental disorder can probably also be said to lack comprehension of the nature and quality of the act or that it was wrong.' " (Guttmacher & Weihofen, Psychiatry and the Law (1952) pp. 432-433, quoted in *People* v. *Hoxie, supra,* 252 Cal.App.2d at p. 915.)

We reject an arguable corollary—that a defendant's plea of insanity comes before a biased jury when the same jurors have already rejected his claim of diminished mental capacity. At the guilt trial the defendant's sanity is conclusively presumed; his mental condition is at issue only in terms of the specific mental state (intent or motive) necessary to establish his guilt of the particular crime; not until the insanity trial opens is the jury faced with the issue of his mental condition in terms of the right-from-wrong test. (*People* v. *Wells, supra,* 33 Cal.2d at p. 350.) If indeed the jury is predisposed against a defendant on the insanity issue, its predisposition does not stem from its verdict at the guilt trial but from the *evidence* it has heard. A well-based verdict of capacity to premeditate does not foreclose a verdict of insanity, but makes it unlikely.[13] The circumstantial evidence which supported the finding of undiminished capacity would be admissible on the insanity issue were the issues heard by the same or separate juries.

At defendant's guilt trial the jury had heard circumstantial evidence of defendant's capacity to premeditate; this evidence had moved it to accept the harmonizing and reject the discordant psychiatric testimony; the same evidence would move it to accept the psychiatric testimony of defendant's sanity and reject that holding him insane; these factors preclude any reasonable probability that the prosecutor's impropriety supplied an inducing factor in the jury's election to find defendant sane. The misconduct was harmless.

The judgment is modified to provide that the sentences for offenses other than first degree murder will run concurrently with the life sentence imposed for first degree murder. The remittitur will direct the trial court

---

[13]One commentator declares: "Concededly, time and plot alone do not automatically transform a homicide into murder of the first degree. . . . They are, however, strong evidence of the defendant's maturity, the extent of his understanding and reflection upon the deed, as well as an indication that he was aware of the enormity of the evil and the consequential reaction of society." (*People* v. *Goedecke, supra,* 65 Cal.2d at p. 863, dissent of Mosk, J.; see also, *People* v. *Hoxie, supra,* 252 Cal. App.2d at pp. 915-916.)

to send an amended commitment to the Department of Corrections. As so modified, the judgment is affirmed.

Richardson, P. J., and Regan, J., concurred.

A petition for a rehearing was denied July 13, 1973, and appellant's petition for a hearing by the Supreme Court was denied August 22, 1973.