[Crim. No. 20312. First Dist., Div. One. Nov. 5, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR SAM CRISCIONE, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Richard S. Kessler, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**NEWSOM, Acting P. J.**—Appellant Arthur Criscione was charged by information with the murder of Dorothy Quintanar, and pled not guilty and not guilty by reason of insanity. A jury trial was held on the guilt phase, and the jury found him guilty of second degree murder. The sanity phase was then conducted, and appellant was found by the jury to have been legally sane at the time of the murder. He was sentenced to state prison for 15 years to life, and now appeals.

It is undisputed that appellant killed his girlfriend, Dorothy Quintanar, on the night of February 27, 1979. At about midnight he arrived at the home of his son, Ricky, age 21, and told him he had killed Dorothy. The two men then drove to the home of appellant's ex-wife (Ricky's mother), but she refused to see him. They then stopped at the police station, where defendant asked to speak to certain officers he was acquainted with, but none of them were available. Next, they drove by Mario's, a bar where appellant worked as a bouncer, then stopped at appellant's apartment so that he might see Dorothy "for the last time." Appellant returned to the car with a photograph of himself and Dorothy, then broke into sobs. Finally the pair drove back to the police station where appellant told the desk officer that he had killed Dorothy.

Appellant was taken into an interrogation room and given *Miranda* warnings. He admitted that he "did it," but declined to say more, although he voluntarily gave the apartment keys to the officer.

Proceeding to appellant's apartment the police found the body of Dorothy in a water-filled bathtub. The coroner determined the cause of death to be strangulation and drowning. It was noted that the victim had bruises on the palm of her right hand consistent with someone putting pressure on the outside of the hand while she held a blunt object. A steak knife was found in the bathtub.

The real controversy at trial centered upon appellant's mental state. The prosecution's theory was first degree murder. Ricky Criscione testified that he recalled his father mentioning Dorothy having a knife, but could not be sure if it was on the night of the killing or some earlier occasion. He acknowledged that his father—a large and strong man—was not likely to have been physically afraid of Dorothy, who was relatively small. Other testimony established that defendant, in his job as a bouncer, was a physically formidable person who had on occasion been able to "handle" a fight with four or five people.

Dorothy's mother testified that the relationship between appellant and Dorothy had been intermittent and tumultuous. Her daughter, she testified, was a PCP addict who often behaved in a bizarre and violent manner—once even stabbing her own brother. Violent arguments between appellant and Dorothy were common: indeed only the week before the killing, appellant and Dorothy had argued wildly, appellant accusing her of infidelity, and to punish her, cutting off her hair. Dorothy returned home to her mother after that, but appellant telephoned a few days later. Her mother, Mrs. Cortez, answered the phone and told appellant to leave Dorothy alone, warning that some day he was going to end up killing her and spending years in prison. Appellant replied that he knew that was true. In yet another conversation with Mrs. Cortez, appellant stated that cutting off Dorothy's hair was nothing compared to what he would do the next time she left him.

The defense at the guilt phase of the trial was diminished capacity, based upon mental illness. Appellant's mother, brother, sister, son, ex-wife, and friends testified concerning defendant's long history of mental illness.

As a child he had exhibited severe mental problems: he was withdrawn, nervous, depressed, abnormal. At about age 14, he began washing his hands obsessively to get rid of germs. On one occasion he had punched a hole through a wall with his fist. So frequent and severe were his aberrant episodes that he was once sent to Livermore Hospital for three months to receive electroshock treatment and insulin therapy.

At the age of 17 appellant married Doris, who was pregnant at the time. Just before the marriage he gave Doris an overdose of sleeping pills, rushed her to the hospital, then reportedly said that if he couldn't have her, he would kill her.

During his marriage to Doris, appellant suffered frequent periods of depression and was hospitalized several times. On numerous occasions he exhibited violence toward his wife, accusing her of infidelity, and on one occasion even tried to strangle her. Finally, in 1976, the marriage ended with Doris filing for divorce.

Appellant worked as a bouncer at Mario's, a bar notorious for drug dealings and other criminal activity. He was described by his employer as an effective employee, who frequently assisted the police in handling violent episodes: on one occasion, in fact, he had asked the police to take Dorothy Quintanar home from Mario's, because she was under the influence of PCP.

At the guilt phase, four psychiatrists testified concerning appellant's prior and current mental state:

(1) Dr. Felche had treated appellant during 1977 and 1978, including two periods of hospitalization. He diagnosed defendant as manic depressive, and considered him suicidal and homicidal, paranoid, psychotic and delusional. Dr. Felche conceded, however, that at the time of his examination—in late 1978—defendant had the ability to form malice aforethought.

(2) Dr. Kowalski had treated defendant in 1976, following his separation from Doris, administering nine electroshock treatments to relieve defendant's severe depression. Dr. Kowalski diagnosed defendant as schizophrenic and depressed, defining the schizophrenia as consisting of "thought disorders, hallucinations, delusions, possibly impulsive behavior, an inability to control one's self, at times."

(3) Dr. Simmang had been superintendent at Livermore sanitarium when appellant was treated there years earlier, and had himself treated appellant in 1968 at Fresno Hospital for schizophrenia and manic depression manifested in withdrawal, suspicion and intolerance. This mental disease, he testified, causes people to "become delusional, hallucinatory, they act out their feelings. And a lot of times it can be violent . . . they are trying to protect themselves from their environment."

(4) Dr. Pirofsky interviewed appellant twice after his arrest, interviewed appellant's son, and reviewed appellant's past medical records. He diagnosed appellant as a seriously ill manic depressive.

Appellant related to Dr. Pirofsky the events of the killing: Dorothy had arrived at his apartment unexpectedly and began to harangue him for infidelity. She threatened him with a knife and he became frightened. He hit her, then grabbed her by the throat and strangled her. He did not know if he killed her or not, but took her into the bathroom and placed her in the bathtub which he kept filled with water to soak his dirty clothes, and held her head under the water.

Dr. Pirofsky concluded that due to his mental illness appellant lacked the capacity to form malice aforethought, to premeditate and deliberate, or to appreciate the criminality of his act.

In addition, the defense presented evidence from Dr. Smith, of the Haight-Ashbury Free Medical Clinic, who testified concerning the unpredictably violent effects of PCP use.

In rebuttal, two psychiatrists testified for the People. Both concluded that defendant was fully capable of forming the intent to kill and malice aforethought, and to deliberate and premeditate. These opinions were based on a review of appellant's historical medical records and on brief interviews with him—Dr. DeLong's of 17-22 minutes, Dr. Doyle's 40-45.

Additionally, the prosecution produced several police witnesses who, relating their experiences with appellant while he worked as a bouncer at Mario's, testified he had never acted uncontrollably when dealing with violent episodes on the premises but seemed always to exhibit assurance and self-control.

At the sanity phase the parties stipulated that the evidence of appellant's mental condition introduced at the guilt phase could be considered by the jury.[1] In addition, appellant presented Dr. Rose, another psychiatrist, who testified that appellant suffered from mental illness—paranoia and manic depression, as a result of which he was unable to conform his behavior to the requirements of law.

On appeal, Criscione makes the following contentions. He first argues that the trial court erred in allowing into evidence a tape recording

---

[1]The defense psychiatrists at the guilt phase gave their opinions concerning appellant's *sanity* as well as his alleged *diminished capacity*. The testimony of Dr. Doyle on the insanity question was later stricken because he had used the *McNaughten* test.

of his custodial interrogation. Second, he contends that trial counsel was incompetent for failing to request instructions concerning appellant's asserted honest but unreasonable belief in the need to defend himself. And, lastly, he argues that the prosecutor engaged in numerous acts of misconduct requiring reversal.

We consider these contentions in an order promotive of convenience of discussion.

## I

Appellant complains of four instances of prosecutorial misconduct, and of the cumulative effect thereof. Recently, in *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], our high court clarified the standards for review of prosecutorial misconduct. ■ If no objection was made below, the objection will be deemed waived unless the misconduct was so egregious it could not have been cured by a timely admonition or retraction by the prosecutor. (*Id.*, at pp. 27-35.) If a successful objection *was* made below and the jury was admonished, then the question for this court is whether, based on the whole record, there was a miscarriage of justice. (*Id.*, at p. 29.)

■ The first complaint of misconduct arose under the following circumstances.

During the guilt phase of the trial, on cross-examination of one of the defense psychiatrists, Dr. Pirofsky, in an obvious attempt to denigrate the idea that appellant was mentally ill, the prosecutor asked about a certain "Rosenhan study." The tenor of the dialogue in which the prosecutor was permitted over defense objection to engage may be fairly judged by the following excerpts:

"Q. . . . The fact that person has been committed to a psychiatric hospital and been treated, certainly that's some evidence that he had mental illness, at least at that time, is that correct?

"A. Yes.

"Q. But there have been mistakes. I cite, for example, the Rosenhan study. Are you familiar with that?

"A. You mean the psychologist at Stanford?

"Q. Right.

"A. Yes. Where he admitted ....

"Q. Okay. There were eight individuals—

"Mr. Mansfield: Well, I'll object to this. He's trying to get a study in before this jury that has no relevance on redirect whatsoever. Objection to that on that basis.

"[Prosecutor]: No. It goes specifically to redirect.

"The Court: The objection's overruled.

"Mr. Mansfield: Thank you.

"Q. (By prosecutor) There were basically—

"Mr. Mansfield: Same objection. He's reciting the test. Let's hear what the test is from the doctor.

"The Court: Yes. I don't think you can testify as to the test, [prosecutor].

"[Prosecutor]: Okay.

"The Court: Objection sustained.

"Q. (By prosecutor) Do you remember what the nature of the test was?

"A. Well, as I recall, that was a psychology professor at Stanford who chose—I don't know whether it was randomly or not—certain individuals to actually fabricate their illness and who were admitted to several hospitals throughout the country, and they were admitted with a diagnosis. They faked the symptoms.

"Mr. Mansfield: Your Honor, you see my objection? Excuse me, Doctor. How can I cross-examine on that? We are being denied the right of confrontation on this thing. Are we now to go up and bring Dr. Rosenthal from some place in Connecticut—

"[Prosecutor]: Rosenhan.

"Mr. Mansfield: —where he's teaching a summer course, maybe, and bring him back here to refute what the test was all about. It's so collateral.

"[Prosecutor]: There is no witness that can refute this test, incidentally.

"The Court: Wait.

"Mr. Mansfield: Mistakes have been made in the medical profession, in psychiatry, as mistakes are made in the law and in carpentering. We have no quarrel with that principle. But to sit here and recite what the test was all about without giving us the opportunity to cross-examine thoroughly on it and whether it's an accepted test or whether it's been refuted by the American Medical Association, we just don't know. I think it's cross-examination on a collateral issue, and my objection is that.

"The Court: Objection overruled. Go ahead."

The error in such proceedings is patent. It consists mainly in the prosecutor's having insinuated by his questions that half of all mental illness is feigned,[2] and that the "test"—whatever it is or may be—was —again in the *prosecutor's* opinion—settled and irrefutable. In fact, all of these assumptions were and are extremely dubious. ▇ Further, it is error to permit the use of professional studies not relied upon by an expert in the formation of his opinion. (Evid. Code, § 721, subd. (b).) To allow their use would be to circumvent the hearsay rule.

Later, in the guilt phase, a family friend of appellant, Mr. Circincone, testified concerning the former's early family life, describing the Crisciones as a "typical Italian family," which elicited from the prosecutor this question, on cross-examination of appellant's brother:

"Mr. Cirincione described your family as a typical Italian family. Does that mean the father is an ogre and the mother is a dominant overbearing person?"

---

[2]At one point Dr. Rose was asked: "Would you stipulate that statistical studies show . . . a fifty percent right ratio?"

This question, besides being childishly argumentative and insulting, foreshadowed the prosecutor's developing purpose of establishing that appellant's violent attitudes and conduct toward the victim, and women in general, were not symptomatic of mental disease, but merely the normal responses of a man raised in a traditional Italian culture. Further examples include the following, from the cross-examination of Dr. Rose at the *sanity* phase:

""Q. Doctor, supposing I lived in a society where women were almost chattels, and women were simply either like children or like property and you beat them as you beat your horse and you displayed them as you would a very tiny child, and I beat my wife. Would I be abnormal?

"A. Not in that society.

"Q. Doctor, you mentioned, in his evaluation, in your evaluation, you brought up the fact that Mr. Criscione, the defendant, saw evil on the outside of him and not in himself. Is that right?

"A. Yes.

"Q. And as an example of that, you told us he condemned her for going out and selling her body but he couldn't see that it was wrong for him to go out and have women, right?

"A. Yes.

"Q. What familiarity do you have, Doctor, with the Italian culture?

"A. Italian culture? In Italy, very little.

"Q. Yes. As it's lived here. But in the culture itself? Heavily, thoroughly Italian? Where you speak Italian at home and you live as if you were in Italy?"

The prosecutor, it will be seen, had not only expressed his own opinion concerning Dr. Rose's familiarity with Italian culture, but now began to suggest that he himself possessed such knowledge and could assist the jury. Thus, after Dr. Rose testified that he had "treated people who grew up in Italian households" but never "made any study of Italian mores," these questions followed:

""Q. Did you ever live in downtown New York on Mott Street?

"A. Never been to New York.

"Q. Would it affect your evaluation, Doctor, if I told you that in downtown New York on Mott Street women are not considered the same as they are in white middle-class San Jose?

"A. No.

"Q. And it would not affect your evaluation?

"A. No.

"Q. It would not affect your evaluation to know that it's not uncommon that women are beaten—

"Mr. Mansfield: I'll object to all of this, Your Honor.

"Q. (By prosecutor)—in Italian households?

"Mr. Mansfield: That's going far afield. If he doesn't know how women are treated on some street in New York.

"[Prosecutor]: I'm asking if it would affect his evaluation.

"The Court: He said no, so—

"[Prosecutor]: To the first question. It's a different one. I say now, if women were beaten, would that affect his evaluation?

"The Court: The objection is sustained."

Still later, in referring to "the double-standard," which he had posited as an accepted fact, the prosecutor put these hypothetical questions, and the following dialogue ensued.

"Q. In the Italian culture, would it affect your evaluation if, in an Italian culture, it's considered normal, acceptable, for a man to have many women but the woman is to remain pure?

"Mr. Mansfield: I think I'll object to that, Your Honor. That's collateral, assuming—

"The Court: There are no facts in evidence, Mr. Prosecutor.

"[Prosecutor]: Your Honor, I'll be happy to testify.

"The Court: Then, you can't argue the case. You want to do that?

"[Prosecutor]: Well—

"The Court: You know that new case, now. The objection is sustained."

Having thus placed before the jury throughout the trial his own irrelevant and spurious[3] opinions, the prosecutor in closing argument in the sanity phase condensed and presented them to the jury as a logical basis for the conclusion that, in killing Dorothy Quintanar, appellant was not suffering from any mental disease, but merely acting out a common Southern Italian masculine role.

Thus:

"But when it comes to somebody else, he's gone through his whole life—the other thing on paranoia—I failed to mention this—in a paranoia, one of the things the doctor mentioned was double standard. Well, the double standard is part of the fact of life of people of particular ethnic extraction, for years and years and years. I hope my wife doesn't hear me say that. But that's not a sign of manicness. [¶] What we have here is a man who has come from a society—and don't get me wrong, please. Italians have degrees of society and there are degrees of attitudes, and people change. But generally speaking, in the European, the traditional European society, women are not given that equal treatment.

"Mr. Mansfield: That's not in evidence. Objected to. I thought we went through all of this at one time.

"The Court: The objection's sustained.

---

[3]See Greeley and McCready: Ethnicity, Theory and Experience (1975) Harvard University Press for a view of Italian male behavior patterns exactly opposite to the prosecutor's, and based upon extensive scientific research.

"Mr. Mansfield: Thank you.

"[Prosecutor]: Approach it this way: If he comes from that kind of society, the evidence does show that he has abused women repeatedly. He has beaten his first wife, he has tried to kill her, he has repeatedly gotten away with it. Why control your impulse to beat her up? You come home after a hard day, whack the wife. It gets rid of your aggressions, relieves the tension. If she gives you a hard time one night, knock her around a little bit. When you go around and you do that and it's accepted, it's accepted not only by society but by the person you are doing it to. And that's sad. But it's true. ¶ So, one night you go a little too far and you kill her. And she's dead. And you come in, defendant comes in and says, 'Oh, ladies and gentlemen of the jury, I was insane. I was insane. Look at my medical record.'"

What is most invidious about such tactics is not the appeal to ethnic prejudice about which appellant complains (cf. *People* v. *Bain* (1971) 5 Cal.3d 839 [97 Cal.Rptr. 684, 489 P.2d 564]), but the palpably false nature of the information argued, which can only have been intended to divert the jury from a rational consideration of the grave question of appellant's sanity.

■ Yet another instance of misconduct concerns the prosecutor's cross-examination of Dr. Pirofsky, at the guilt phase, where a series of questions implied that, if released, appellant was likely to kill again. Thus:

"Q. Doctor, the question I have is: when will he kill again?

"A. That, I couldn't say.

"Q. But he very well could kill again, couldn't he, Doctor?

"A. No more so than anyone else who has never killed. I think that the studies that Dr. Diamond, Bernie Diamond has done illustrate that there is no concordance of evidence that someone who has killed once would statistically kill again, any more than somebody who has never killed.

"Q. Doctor, you would describe to us, in your attempt to eliminate this man's—reduce this man's guilt, he has a condition where he cannot

control himself, and that's the product of his mental illness, is that right?

"A. No. He can't control himself because of the mental illness.

"Q. Okay. Because of the mental illness, he can't control himself. Something happens. He perceives things in the wrong way because of his mental illness. He can't control himself, and he does something. He may beat a woman, he may cut her hair off, or he may kill her. Is that right?

"A. He has.

"Q. And in each case, when he kills Dorothy Quintanar, when he kills Miss Jones, when he kills Miss Smith, and the next victim, you will come in and say he could not harbor malice aforethought. Is that right, Doctor?

"Mr. Mansfield: That's very—

"The Witness: That's totally incorrect.

"Mr. Mansfield: Excuse me, Counsel.

"The Court: Wait.

"Mr. Mansfield: Objection, Your Honor.

"The Court: On what basis?

"Mr. Mansfield: That is an improper question, that when he kills Miss Jones and three other people, then this doctor will come in and testify that he didn't have the whatever he needs to form the mental—

"The Court: Objection sustained."

Further examples of alleged prejudicial questions include these:

"Q. He's a licensed killer?

"A. A licensed killer? . . . .

"Q. If he jumped up off that chair right now and came over and killed you, walked over, took a hammer and smashed you on top of the head, he could not form the. necessary intent to kill? Malice aforethought?

"A. I wouldn't be in a position to respond to that, if he did that. But that would be subject to some examination, the act itself.

"Q. If he kills you, we'll examine him.

"A. If he kills me, you will examine him."

The impropriety of this course of cross-examination needs little demonstration. Replete with argument and improper statements of personal opinion (*People* v. *Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 529 [58 Cal.Rptr. 332, 426 P.2d 900]), it is also inflammatory in its open appeal to the jury's senses of fear and anger. The error was compounded at the sanity phase where the prosecutor stated in closing argument, "I hope working hard doesn't mean you're crazy, because we've got to start locking up a lot of people. Of course, we don't lock them up. We just call them insane." The sole and central issue at the sanity phase of the trial was appellant's mental condition at the time he killed his victim. How appellant would be treated, or how long incarcerated, in the event he were to be found insane, were of course not permissible subjects for speculation by the jury. (*People* v. *Mendoza* (1974) 37 Cal.App.3d 717, 727 [112 Cal.Rptr. 565].) And here, certainly, to repeatedly—and falsely[4]—suggest that the criminally insane, however violent, are immediately set free to prey upon society, was mere pandering to the jury's prejudices. (See *People* v. *Johnson* (1960) 178 Cal.App.2d 360, 370-371 [3 Cal.Rptr. 28]; *People* v. *Mallette* (1940) 39 Cal.App.2d 294, 299-300 [102 P.2d 1084]; cf. *People* v. *Smith* (1973) 33 Cal.App.3d 51, 71, fn. 8 [108 Cal.Rptr. 698], and cases there cited.)

Since we not long ago had occasion to consider misconduct by the same prosecutor, involving the same lurid reliance on ethnic irrelevancies, it may be appropriate here to recall what was said in *People* v.

[4]See Penal Code section 1026 for the correct statement of the law concerning treatment and incarceration of the criminally insane.

*Talle* (1952) 111 Cal.App.2d 650, 677-678 [245 P.2d 633], under rather similar circumstances: "[P]rosecuting attorneys are government officials and clothed with the dignity and prestige of their office. What they say to the jury is necessarily weighted with that prestige. It is their duty to see to it that those accused of crime are afforded a fair trial. . . . [¶] It would be a sad day for the administration of justice if this court were to condone the substitution of the personal belief of the district attorney . . . that the accused should be convicted because the district attorney thinks he should, for what the law guarantees—a fair jury trial."

And, more recently, in an opinion of this court: "'Fewer judgments would have to be reversed if the trial courts were more firm in controlling the comparatively few prosecutors who need restraint.'" (*People v. Rodgers* (1980) 90 Cal.App.3d 368, 373 [153 Cal.Rptr. 382].)

■ As will have been observed, most of the cited instances of prosecutorial misconduct occurred during the sanity rather than the guilt phase of the trial. And of such instances, by far the most damaging and prejudicial was the prosecutor's reference to the probable lenity which would follow a finding of appellant's insanity as well as the consequent likelihood of great danger to the community at large. Moreover, the cumulative effect of such repeated misconduct weighs most heavily in the sanity, rather than guilt, phase. Evidence of appellant's *guilt*, while conflicting, seems so substantial as to have been but little influenced by the prosecutor's tactics.

Concerning appellant's sanity, however, the matter is different. Having determined that appellant was not suffering from diminished capacity, the jury nevertheless had the option—on additional testimony and further reflection—to determine that, at the time of the killing, he was in fact insane and consequently not guilty on that basis. Because of the prosecutor's conduct, no fair opportunity was ever afforded appellant to have such a determination made. And since we are unable to conclude beyond a reasonable doubt that the cumulative impact of these repeated acts of misconduct had no effect in bringing about the guilty verdict (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People v. Williams* (1971) 22 Cal.App.3d 34, 58 [99 Cal.Rptr. 103]), we are compelled to reverse the jury's finding that appellant was sane at the time of the murder.

## II

■ Appellant's second major contention centers upon admission into evidence of his statements to the police following his arrest.

As the record discloses, appellant was asked a series of preliminary questions—name, age, address, employment history, etc.—and then given his *"Miranda"* warnings. He declined to speak further about the killing. The prosecution sought to admit a tape recording of that conversation (up to the point of the Miranda warnings)—not for the truth of the matters stated therein, but to show defendant's tone of voice, composure and mental condition at the time. Over objection the tape was played for the jury, admitted into evidence, and later extensively argued by the prosecutor as proof of appellant's sanity.

After the conclusion of the trial and during the pendency of this appeal, the California Supreme Court in *People* v. *Rucker* (1980) 26 Cal.3d 368 [162 Cal.Rptr. 13, 605 P.2d 843], held such evidence inadmissible: even booking or otherwise neutral information is testimonial and within the privilege against self-incrimination. "The privilege against self-incrimination is not a hearsay rule. To have ... testimonial value, a compelled disclosure need not be obtained or admitted into evidence to prove its substantive truth." (P. 384.)

While, as the People contend, other evidence supported the conclusion that appellant's conduct was outwardly normal, so that no prejudice otherwise could be said to flow from the error in admitting the tape, the issue becomes closer in the light of the prosecutor's argument, in which he ascribes to appellant a series of statements which, as the record shows, the latter never made. Nevertheless, on balance, we think the error harmless in the light of other substantial evidence that appellant's behavior following arrest manifested signs of great emotional or mental stress. (*Chapman* v. *California, supra,* 386 U.S. 18.)

## III

■ Appellant's third and final argument is that trial counsel was incompetent in failing to present the defense of "imperfect" self-defense.

While appellant did not testify at either phase of his trial, his version of the events surrounding the killing was presented through detailed psychiatric testimony. In statements thus given the jury, appellant as-

serted that the victim, angry and jealous over his alleged infidelity, drew a knife and accosted him, and that he grabbed her from behind and strangled her. A defense psychiatrist, Dr. Pirofsky, concluded that due to his mental illness, defendant perceived Dorothy at that moment as a grave threat—not so much in a physical sense, but as an emotional-psychological threat to his masculinity. This, then, was the impulse that triggered the killing.

Appellant now argues that defense counsel should have gone *beyond* the defense of diminished capacity so vigorously and thoroughly presented at the guilt phase and should have requested instructions on "imperfect" self-defense—that is, the honest, but unreasonable belief that one is in danger which might negate the malice aforethought necessary for a murder conviction, thus reducing the offense to manslaughter. (*People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].)

The court in *Flannel*, while recognizing "imperfect" self-defense as a legitimate defense, concluded it was not a defense which called for instructions *sua sponte* in cases tried prior to the court's decision. (*People* v. *Flannel, supra*, 25 Cal.3d at p. 683.)

The failure to present such a defense here in our view falls far short of establishing incompetence of counsel as set forth in *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859]. Clear reasons of trial strategy at once appear from the trial record which justify counsel's choice of tactics. Such a defense, for example, would have been inconsistent with a vigorous defense on grounds of diminished capacity. An honestly held fear of the victim might well have seemed incredible in view of appellant's size, strength and past employment as a "bouncer" in a neighborhood bar renowned for its violence. Moreover, the psychiatric portrait of appellant's mental and emotional condition at the time of the killing might well have been undermined by such a defense. ■  And, finally, as this court said in *People* v. *Russell* (1980) 101 Cal.App.3d 665, 668 [161 Cal.Rptr. 735], rejecting an incompetency claim, counsel are not to be faulted for failing to anticipate subsequent Supreme Court decisions, prescience being no more required of competent counsel than omniscience.

The jury's finding that appellant was sane at the time of killing Dorothy Quintanar is reversed and the matter remanded to the trial court for further proceedings not inconsistent with the views expressed herein.

Grodin, J., concurred.

**FIGONE, J.\***—I concur:

Demanding serious consideration is the defense contention of appeal to ethnic prejudice in the prosecutor's argument during the sanity trial.

The traditional test of prejudicial error in applying the harmless error rule on appeal is whether it is "reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant." (*People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396], citing *People v. Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].)

A second test of prejudicial error is referred to in *Bolton, supra,* as one involving federal constitutional error. Under this test, as enunciated by Justice Hugo L. Black in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], "... before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

The prosecutor's allusion to Italians and his unsupported statement that "women are not given equal treatment" in his argument ignite the flames of ethnic prejudice.[1] Twice before during the cross-examination of the defense forensic expert, the prosecutor gave unsworn testimony of two studies he had of Italian-American lifestyles and mores and unsworn testimony about Italian men "... to have many women but the women to remain pure."[2] The insinuation is that the defendant was not

---

\*Assigned by the Chairperson of the Judicial Council.

[1]"The artistic and hot-tempered Italian, representing a cross between the temperamental maestro and the cheerful organ grinder, is still with us; but ... he is only a faded image of his former self." (Gilbert, *Stereotype persistence and change among college students* (1951) J. Abnormal & Soc. Psych., 46, 245-254.)

[2]Prosecutor did not, of course, reveal his sources. However, it is interesting to note that in a study undertaken by Andrew M. Greeley and William C. McCready and edited by Nathan Glazer and Daniel P. Moynihan, Ethnicity, Theory and Experience (1975) the sociologists conclude the exact opposite. "Our only mistake was to assume that Italian sexual restrictiveness would be limited to female sexual behavior. In fact, the Italians are also sexually restrictive for males." (*Ibid.,* at p. 220.)

insane, but normal and sane in the eyes of his peer group because, he argues, Italians are known to have different standards in relationships with women. The implication is that Italian-American mores are different than contemporary community standards—so that a normal Italian-American male treats women brutally, as did the defendant in the instant case.

However, the felling blow in the prosecutor's appeal to ethnic prejudice came when in argument he gave personal opinions concerning the defendant's sanity, by referring to his understanding of Italians and, in particular, to his own wife. "I hope my wife doesn't hear me say that. But that's not a sign of manicness." The implication was, clearly, that he, as the prosecutor and an Italian-American, knew that the defendant acted as a sane man, because Italian men normally abuse women.

In confronting the issue of a black prosecutor commenting on the guilt of a black defendant the court in *People v. Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564] recognized that a personal belief in defendant's guilt, built on racial foundations, might well have swayed the jury.[3] (See also Witkin, Cal. Criminal Procedure (1963) Appeals to Passion or Prejudice, § 463, p. 468.)

Under the traditional test of prejudicial error as enunciated in *People v. Bolton, supra*, 23 Cal.3d 208, it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from ethnic slurs and from continuously harping on the fact that defendant was an Italian-American.

---

[3]"[T]he prosecutor, in effect, asked the jury to give credence to his belief in defendant's guilt from the inception of the case, because he, as a black man, 'understood' black defendants. This tactic was a way of persuading the jury that the defendant's story was a sham that could not convince any other black person. [Fn. omitted.]" (*People v. Bain, supra*, 5 Cal.3d at p. 848.)