Filed 7/16/15  P. v. Quesenberry CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>PIERCE EUGENE QUESENBERRY,<br><br>　　　　Defendant and Appellant. | A142923<br><br>(Lake County<br>Super. Ct. No. CR935652) |

Alleging instructional error or, alternatively, ineffective assistance of counsel, Pierce Eugene Quesenberry appeals from a judgment entered on the verdict of a jury convicting him of criminal threats (Pen. Code, § 422),[1] elder abuse likely to produce great bodily injury or death (§ 368, subd. (b)(1)), and two misdemeanor violations of battery against an elder (§ 243.25), all upon his mother.  Appellant advances four arguments:  that (1) the  trial court had a responsibility to instruct the jury sua sponte on the meaning of the word "likely" in the context of elder abuse "likely to produce great bodily injury," (2) defense counsel's failure to object to the prosecution's misstatement of law as to elder abuse "likely to produce great bodily injury" constituted ineffective assistance of counsel, (3) defense counsel's failure to object to the prosecutor's argument regarding the testimony of victims of domestic violence, "based on his own supposed personal experience" also constituted ineffective assistance of counsel, and (4) defense

_____

[1] All statutory references are to the Penal Code.

1

counsel's failure to request that the jury be instructed on accident as a defense to elder abuse, also constituted ineffective assistance of counsel.

We shall conclude that these contentions lack merit.

## FACTS AND PROCEEDINGS BELOW

At the time of the offenses, Leona Stoll, appellant's 85-year-old mother, who walked with a cane due to difficulty maintaining her balance, was receiving medical treatment for heart failure, high blood pressure, diabetes, and arthritis. Appellant, who had been living in Stoll's home for about a year, had lived with her on and off for 10 years and was aware of her poor health.

On April 21, 2014, Stoll told appellant she wanted his friends, who she disliked and came there to drink, to leave the house. After she and appellant argued about this, she went to her bedroom to pack her bags to leave and appellant followed her into her room. Stoll related what next happened to Clearlake Police Officer Elvis Cook, who responded to her call for police assistance. As Stoll was taking clothes out of a dresser in her bedroom, appellant grabbed her by the hair near her forehead and shoved her forcefully to the floor, causing her to fall to the floor. As she fell, her body hit the dresser. The impact left a bruise on her right arm, and the fall also injured her forehead and nose. Appellant shoved her two or three times while she was on the floor while yelling that he was going to "smash her face in." Appellant had threatened Stoll in this way many times in the past, and she feared he might carry out the threat.

Although Stoll testified a bit differently at trial, she told Officer Cook that appellant refused her requests to help her stand up, requiring her to crawl to the door and pull herself up by gripping the jamb hand over hand. She also told the officer that after appellant knocked her down "he continued to keep pushing her down on the ground two or three times as he was yelling he was going to smash her face." At that time, Stoll said "she was in fear the he could kill her."

Stoll stated that the previous day, April 20, while she was sitting in her bedroom, appellant became angry and kicked a footstool, which hit her ankle and caused bruising. According to her, appellant was having a "temper fit." The kicking of the stool and

2

resulting injury were the basis for the misdemeanor charge that appellant committed battery against an elder in violation of section 243.25.

Stoll testified that she and appellant, who she described as "having a short fuse," argued frequently. As an example she described an altercation in August 2010, in which appellant "threw my stuff off the porch to aggravate me." Stoll was shown a police incident report stating that she told a police officer at that time that appellant had pushed her on two or three occasions and threw her belongings off the porch. Reminded that she had testified about these uncharged prior events earlier in the present case, Stoll acknowledged appellant had pushed her "on other occasions where he said he was going to smash your face in."

Appellant, the only defense witness, stated that on April 21, he and his mother argued about her driving to and from the post office under the influence of her medications. Appellant denied grabbing his mother by her hair, or pushing or throwing her down, and he never threatened to smash her face in. According to appellant, he didn't throw her things out of the house and "wasn't mad at my mother about anything"; she packed her bags to leave solely due to her anger at him.

As to the incident the prior evening, appellant testified that he acted out of "irritation" after a "disagreement" with his mother. Admitting that his kicking of a footstool injured his mother, he stated that he did not intend to harm her. With respect to the uncharged altercation in August 2010, appellant acknowledged he had pled no contest to the offense, but testified that his conduct only involved "nudging" his mother.

## DISCUSSION

### I.

#### *The Court's Failure to Define the Word "Likely" Was Not Prejudicial Even Assuming it Was Erroneous*

With respect to the offense of elder abuse, the jury was given the instruction prescribed by CALCRIM No. 830, which instructs that, to prove that the defendant is guilty of the elder abuse offense defined by section 368, subdivision (b)(1), "the People must prove that: [¶] 1. The defendant willfully inflicted unjustifiable physical pain or

3

mental suffering on Leona Stoll; [¶] 2. The defendant inflicted suffering on Leona Stoll *under circumstances or conditions likely to produce great bodily harm or death*; [¶] 3. Leona Stall is an elder. [¶] AND [¶] 4. When the defendant acted, he knew or reasonably should have known that Leona Stoll was an elder." (Italics added.)

The court was not asked to define the word "likely" and did not do so; although the CALCRIM instruction that was given did define the words or phrases "willfully," "great bodily injury," "elder" and "unjustifiable."

Appellant does not dispute that a jury need not be instructed on the meaning of words "commonly understood by those familiar with the English language." (*People v. Anderson* (1966) 64 Cal.2d 633, 639-640.) His contention is that, insofar as it appears in the definition of elder abuse as conduct "likely to produce great bodily injury or death," the word "likely" has a technical or legal meaning that differs from its nonlegal or common meaning, and that the technical or legal meaning is *not* "commonly understood by those familiar with the English language."

Appellant's argument rests on *People v. Wilson* (2006) 138 Cal.App.4th 1197 (*Wilson*). The appellant in that case was charged with felony child endangerment in violation of section 273a, subdivision (a), which, as material, provides that the offense occurs when: "Any person who, *under circumstances or conditions likely to produce great bodily harm or death*, willfully causes or permits any child to suffer . . . unjustifiable physical pain or mental suffering" (§ 273a, subd. (a), italics added), or other forms of endangerment. The appellant in *Wilson* claimed there was insufficient evidence of child endangerment because the circumstances on which the prosecution relied were, as a matter of law, not " 'likely to produce great bodily injury or death.' " (*Wilson*, at p. 1201, italics added.) After analyzing the opinion of our Supreme Court in *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, which "provided an in-depth review of the troublesome word 'likely' " (*Wilson*, at p. 1202) as it appeared in the Sexually Violent Predator Act (SVPA), the court held that "likely," as used in section 273a does *not* mean "that death or serious injury is probable or more likely than not," but instead

4

means that the defendant's act presented "a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death." (*Wilson*, at p. 1204)

As stated in *Wilson*, *Ghilotti* noted that: " 'California decisions indicate a varied contextual understanding of the word "likely." ' [Citation.] Using cases dealing with child endangerment as one example, the [*Ghilotti*] court observed: 'In *People v. Sargent* (1999) 19 Cal.4th 1206, we said in passing that the felony child endangerment statute, which punishes a caretaker's willful abuse or neglect of a child under " ' "circumstances . . . likely to produce great bodily harm or death" ' " (Pen. Code, § 273a, subd, (a)) is " 'intended to protect a child from an abusive situation in which the probability of serious injury is great.' " [Citations.] But *People v. Hansen* (1997) 59 Cal.App.4th 473 indicated that this statute is satisfied when the child is placed in a situation where a serious health hazard or physical danger is "reasonably foreseeable" [citation], as where the caretaker stores a loaded gun in a home occupied by children without denying the children access to the weapon. [Citation.]' (*Ghilotti, supra*, 27 Cal.4th at p. 917.)

"As a further example of the varied contextual understanding of the term 'likely' in California cases, the court in *Ghilotti* cited *People v. Savedra* (1993) 15 Cal.App.4th 738. There the defendant was charged with possessing a deadly weapon in a jail. The court instructed a deadly weapon was any instrument or object likely to cause death or great bodily injury. When the jury asked if 'likely' meant more probable than not or merely possible, the trial court replied that 'likely' referred to the 'potential' for use of a deadly weapon. The Court of Appeal agreed. Noting that although 'likely' most often means 'more likely than not,' the word has a broader meaning in connection with a statute seeking to protect inmates and jail personnel from armed attack. (*Ghilotti, supra*, 27 Cal.4th at pp. 917-918.)

"After giving other examples of how context affects the use of the word 'likely' in various legal settings, the court gave examples of statutes in which the Legislature specifically used the term 'more likely than not.' The [*Ghilotti*] court concluded that the mere use of the word 'likely' in any given context was not proof the Legislature intended it to mean 'more likely than not.' The court stated it was necessary to look to the context

of legislation to determine what meaning the Legislature intended in using the term 'likely.' (*Ghilotti, supra*, 27 Cal.4th at p. 918.)

"The court noted that the purpose of the SVPA was to protect the public from a limited group of persons, previously convicted for violent sex offenses, who because of a current mental disorder presented a high risk of reoffense. The court concluded that in the SVPA context, 'likely to reoffend' meant more than a mere possibility of reoffense but did not require that the chance of reoffense be better than even. Rather, the test was whether the person presented a '*substantial danger*— . . . *a serious and well-founded risk*—of [reoffense].' (*Ghilotti, supra*, 27 Cal.4th at pp. 916, 922.)" (*Wilson, supra*, 138 Cal.App.4th at pp. 1203-1204.)

The *Wilson* court concluded that though the analysis in *Ghilotti* was developed in a different legal context from that it confronted, the *Ghilotti* court's "adaptation of the definition of 'likely' as used in the SVPA context is appropriate here. We thus conclude that 'likely' as used in section 273a means a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death. We believe in the context of child endangerment this definition of the term 'likely' draws a fair balance between the broad protection the Legislature intended for vulnerable children and the level of seriousness required for a felony conviction." (*Wilson, supra*, 138 Cal.App.4th at p. 1204.)

Appellant points out that while section 273a, the statute at issue in *Wilson*, applies to child abuse, not elder abuse, which is the subject of section 368, "[s]ection 368 is patterned on the felony child abuse statute, section 273a" (*Roman v. Superior Court* (2003) 113 Cal.App.4th 27, 35), and we should therefore accept the analysis and conclusion of *Wilson*. The gist of his claim is that it would be anomalous to grant a higher level of protection to persons who are vulnerable because they are young than to elders whose vulnerability also arises from their age. Like section 273a, section 368 was intended to protect certain persons from an abusive situation in which, due to their age, the probability of serious injury is great. Accordingly, the latter statute should also be satisfied when the protected person is subjected to a serious and well-founded risk of great bodily harm.

6

The Attorney General's first response to appellant's argument is that he provides no reason to conclude the ordinary meaning of the word "likely"—i.e., "having a better chance of occurring than not" actually conflicts with the meaning he would have us attribute to the word—namely, "a *substantial danger*," i.e., a "serious and well-founded risk" of "great bodily harm or death." (*People v. Roberge* (2003) 29 Cal.4th 979, 988.) According to the Attorney General, "[a] person faced with even a modest chance of great bodily injury would surely consider that risk to be 'substantial' and 'serious.' " What the Attorney General apparently means is that the nature of the risk—i.e., "great bodily injury or death"—ipso facto renders it a "substantial" or "serious" possibility. Defining the likelihood injury will occur by the seriousness of the injury the statute is designed to prevent seems to us logically questionable. Moreover, the use of such a criterion would not only diminish the People's burden of proof but shift attention away from the foreseeability of injury that the *Ghilotti* majority, and the opinion in *People v. Hansen, supra,* 59 Cal.App.4th 473, considered a critical factor.

In fact, the definition of "likely" that appellant urges us to adopt may be less favorable to him and others charged with violation of section 368 than he realizes. Appellant appears to view the definition of "likely" as involving "serious and well-founded risk" as setting a higher standard than "probable or more likely than not." But the description (in the same sentence) of the nature of the risk—"great bodily harm or death"—invites a jury to place weight on the gravity of the charged offense, which may be detrimental to the interests of the accused. Indeed, the instruction appellant seeks might well enable prosecutors to argue, as does the Attorney General in this case, that in the minds of many reasonable people even "a modest chance of great bodily injury" would constitute a "substantial" and "serious" risk.

Alternatively, the Attorney General points out that the definition of "likely" endorsed in *Ghilotti* was developed for a purpose different from that it would have in connection with section 368. As she states, the definition adopted in *Ghilotti* was not designed "to measure the likelihood an action will cause great bodily harm, but to assess a sex offender's likelihood of reoffending." We think there is something to this

7

argument. As Justice Werdegar pointed out in *Ghilotti*, the SVPA focuses on the problem presented by repeat violent sex offenders, and the drafters "narrowly tailored the law to those who were extremely dangerous, not merely by virtue of their past offenses, but because, in their present state, they were actually likely to reoffend." (*Ghilotti, supra*, 27 Cal.4th at p. 933, conc. opn. of Werdegar, J.) By definition, a sexually violent predator must have a " ' "diagnosed mental disorder" ' " that " 'predisposes the person to the commission of criminal sexual acts.' " (*Id.* at p. 931.) The likelihood of reoffense in this context is entirely different from the likelihood of great bodily harm resulting from particular physical conduct. Thus, the context in which *Ghilotti* was decided is more significantly different from that presented in child (and elder) abuse cases than the *Wilson* court appears to have appreciated.

This point was made in *People v. Chaffin* (2009) 173 Cal.App.4th 1348 (*Chaffin*), in the context of child endangerment under section 273a. Conceding that *Wilson* applied the definition of "likely" prescribed in *Ghilotti* to a child abuse statute analogous to the elder abuse statute applicable in the present case, the Attorney General points out *Chaffin* criticized *Wilson's* application of *Ghilotti*. In *Chaffin*, a panel of the Fourth District questioned "whether *Wilson* should have relied so heavily on *Ghilotti* because the considerations pertinent to the SVPA . . . are not raised by section 273a." (*Chaffin*, at p. 1351) *Chaffin* explained, "[b]oth the SVPA and section 273a serve to protect others from abuse. The SVPA operates by providing procedures for the involuntary civil commitment of those sexually violent predators *who, in fact, pose a high risk of reoffense in the future*. Section 273a protects children from existing abusive situations by punishing offenders upon conviction . . . ." (*Id*. at pp. 1351-1352, italics added.) The same distinction can be made between the SPVA and section 368.

Because sexually violent predators pose such a high risk of reoffense in the future, the "clear overall purpose" of the SVPA "is to protect the public from that limited group of persons . . . ." (*Ghilotti, supra*, 27 Cal.4th at p. 921.) Achieving that purpose is complicated by "the 'difficulties inherent in predicting human behavior' " (*ibid*.), and the *Ghilotti* court construed the word "likely" in the light of those difficulties. (*Ibid*.) As

*Chaffin* points out, "the word 'likely' [as used] in section 273a does not serve as a measure for the difficult and imprecise task of predicting future human behavior.  Rather, it is merely a measure of determining the risk of present injury created by external and tangible circumstances or conditions." (*Chaffin, supra,* 173 Cal.App.4th at p. 1352, citing *People v. Sargent, supra*, 19 Cal.4th at p. 1223.)  The same is true in section 368.

As the foregoing discussion indicates, the question whether the word "likely," as it appears in section 368 has a technical or legal meaning that differs from its nonlegal or common meaning is complex and has not been definitively resolved by the courts; nor have the parties adequately come to grips with the issue in their briefs.  Fortunately, it is not a matter we need to resolve.

"An instruction that omits a required definition of or misdescribes an element of an offense is harmless only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' *(People v. Harris* (1994) 9 Cal.4th 407, 424, quoting *Chapman v. California* (1967) 386 U.S. 18, 24.)  'To say that the error did not contribute to the verdict is . . . to find the error unimportant  in relation to everything else the jury considered on the issue in question, as revealed in the record.' (*Yates v. Evatt* (1991) 500 U.S. 391, 403.)" (*People v. Mayfield* (1997) 14 Cal.4th 668, 774.)

Even if the trial court's failure to sua sponte define the word "likely" as used in section 368 and CALCRIM No. 830 was erroneous, and the court should have told the jury that in order to convict appellant under the statute it must find that the circumstances in which he acted presented "a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death" (*Wilson, supra*, 138 Cal.App.4th at p. 1204), there is no reasonable doubt that such error did not contribute to the verdict obtained.  On the contrary, we believe the record and reason compel us to conclude that the failure to so instruct was unimportant in comparison to all of the other evidence the jury considered. In short, it is impossible for us to believe that the verdict would have been different if the omitted instruction had been given.

9

First of all, as earlier noted, the instruction prescribed in *Ghilotti* and adopted in *Wilson* is not clearly more favorable to appellant than the common understanding of the word "likely." As the Attorney General points out, *Ghilotti* indicates that its definition imposed a lower evidentiary hurdle than a definition of "likely" as meaning "*the chance of reoffense i*s *better than even.*"

Second, instructing the jury that it had to find a serious and substantial risk of great bodily harm simply would not have made any difference in this case. Appellant does not dispute that he knew his 85-year-old mother suffered from heart failure, high blood pressure, diabetes and arthritis, and was unable to walk without the use of a cane. Moreover, he did not testify or present any other evidence that, in the circumstances and in light of his mother's physical condition, the abusive acts charged and testified to by Stoll and Officer Cook would not likely have resulted in great bodily harm; his testimony was that he did not commit the charged acts of elder abuse.

It seems to us all but inconceivable that a reasonable jury would think the acts of grabbing the hair of a frail 85-year-old who suffered from heart failure, high blood pressure and other serious medical conditions, forcing her impactfully to the floor after hitting a dresser on the way down, and repeatedly shoving her while she was on the floor while yelling that he was going to "smash her face in," would not present a "substantial danger" or "serious and well-founded risk" of infliction of great bodily harm.

It is in our view " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Harris*, *supra*, 9 Cal.4th at p. 424.)

## II.

### *Defense Counsel's Failure to Object to the Prosecution's Definition of "Likely" Did Not Constitute Ineffective Assistance of Counsel*

In her closing argument, the prosecutor told the jury that Stoll is "not, you know, a healthy 22-year-old being pushed to the floor. She's 85 years old and she's got various health problems, health problems that defendant's aware of, health problems that make it difficult for her to even get up off the ground, including heart problems and blood pressure issues. So you can take sort of her as an eggshell and you can look at—in other

words if you take, you know, an object that's not easy to break versus her that's a little more easy to break, that's when I think you're looking at great bodily harm was a *potential* here. It didn't happen, and it doesn't have to happen. *It's just the potential of it to happen*." (Italics added.)

In his closing argument, defense counsel contested the district's attorney statement that "potential" great bodily harm was sufficient, reminding jurors that the court's instruction required them to decide whether the infliction of great bodily harm was "likely." In her rebuttal, the district attorney stated that she was "not sure of the difference between potential or likely," but maintained that, "under these circumstances," appellant's conduct "was likely to create great bodily injury."

The failure of counsel to correct opposing counsel's misstatement of law requires reversal only if there can be no satisfactory explanation for not objecting and "there is a reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694 (*Strickland*).)

Because the prosecutor appears to have acceded to the jury's use of "likely" rather than "potential," it is not clear that her initial use of "potential" was a material misstatement or, if it was, that is was not cured. Nevertheless, indulging appellant's assumptions that the prosecutor misstated the law and there was no reason for defense counsel not to object, we conclude—for the reasons we have discussed in finding the instructional error non-prejudicial—that there is no reasonable probability the result would have been different if the objection had been made.

### III.

### *Defense Counsel's Failure to Object to Statements Made by the Prosecutor During Closing Argument Was Not Professionally Deficient*

In her opening argument to the jury, the prosecutor indicated that there were "some issues with [Stoll's] credibility while testifying," because her recorded statements to Officer Cook at the scene, which were made when her memory was fresh, painted a worse picture of appellant's conduct than her testimony at trial. Her subsequent

11

testimony soft-pedaled appellant's conduct, the prosecutor suggested, because "she lost her son," "[s]he [didn't] want to get him in trouble," and also "[s]he may have some memory problems." The prosecutor then stated "this really is like a domestic violence case," and "it's not uncommon for victims in those situations to recant, minimize, try not to get their loved one in trouble. And I think that's really evident by what she told you, that she hesitated going to the police. She debated about it. She didn't want to come testify, she told you. She didn't want to be here. Again, she loves him and doesn't want to see him in trouble."

Appellant maintains that the foregoing statements constituted prosecutorial misconduct for two reasons. First, the prosecutor was "arguing from her own personal expertise" and, second, "she was serving as [her] own unsworn witness," and therefore violated appellant's Sixth Amendment right to confront witnesses against him. Appellant argued that his attorney rendered ineffective assistance of counsel (*Strickland, supra,* 466 U.S. 668) in that competent counsel would have objected to the prosecutor's statements and requested an admonition, defense counsel's failure to do so served no strategic purpose and was professionally deficient, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. We cannot agree.

It is, as appellant says, misconduct for a prosecutor to argue from his or her own experience. But the two cases appellant relies upon—*People v. Mendoza* (1974) 37 Cal.App.3d 717 (*Mendoza*) and *People v. Criscione* (1981) 125 Cal.App.3d 275 (*Criscione*)—do not show the prosecutor in this case presented such an improper argument.

In *Mendoza*, in which the defendant was convicted of committing a lewd act on a child under 14 years of age, the prosecutor told the jury: " 'It is the very little, small, mild people, some of whom, rather than being prosecuted, go to psychiatric care, who maybe ultimately molest, sexually attack, and even kill their granddaughters, friends who come to the house to see them, or the child is found in Griffith Park. These are things that happen all the time. . . . There are more, many more articles in newspapers; you

12

have all read them, that say, "Hey, you know, we didn't think this guy was too dangerous. He looked kind of meek." And we don't know how fragile Mr. Mendoza is. There is no evidence as to how fragile he is, but he looked sort of meek. We didn't really know; we didn't realize, and this is after death and worse that leaves injury on these kids.' " (*Mendoza, supra*, 37 Cal.App.3d at p. 726.) These statements were not declared misconduct for the reasons alleged by appellant in this case, but on the very different ground that they "drew unjustifiable inferences from Mendoza's conduct and dwelt on suppositions not reflected in evidence before the jury." (*Ibid.*) Furthermore, in other statements to the jury, the prosecutor in *Mendoza* "misstated the law" and otherwise made a "stronger appeal to passion and prejudice." (*Id*. at pp. 726-727.) The prosecutor in *Mendoza* was not charged with "arguing from his own personal expertise" or serving as his own expert witness, and the case has little to do with prosecutorial violation of a defendant's confrontation rights under the Sixth Amendment.

*Criscione, supra,* 125 Cal.App.3d 275 is a case in which the prosecutor improperly set himself up as an expert. The defendant in that case, who was ethnically a southern Italian, killed his girlfriend; the real controversy at trial centered upon his mental state. During both the guilt and penalty phases of trial, the prosecutor engaged in extensive cross examination of defense psychiatrists to which defense counsel objected. The cross-examinations all insinuated that mental illness is often feigned, that the defendant's violent attitudes relating to women were merely the normal responses of a man raised in a traditional Italian culture and that, if released, he was likely to kill again. To take one of many examples, when commenting upon the testimony of an expert witness that paranoia often results in the use of a double standard, the prosecutor, who was himself also an Italian-American, stated that " 'the double standard is part of the fact of life of people of particular ethnic extraction, for years and years and years. I hope my wife doesn't hear me say that. But that's not a sign of manicness. [¶] What we have here is a man who has come from a society—and don't get me wrong, please. Italians have degrees of society and there are degrees of attitudes, and people change. But generally speaking, in

13

the European, the traditional European society, women are not given equal treatment.' "[2] (*Id*. at p. 289.)  As the court observed, "[h]aving thus placed before the jury throughout the trial his own irrelevant and spurious opinions, the prosecutor in closing argument in the sanity phase condensed and presented them to the jury as a logical basis for the conclusion that, in killing [his victim], appellant was not suffering from any mental disease, but merely acting out a common Southern Italian masculine role."  (*Id*. at p. 289, fn. omitted.)  The hyper masculine role and gender bias attributed to Italian men from the Mezzogiorno by the prosecutor in *Criscione* is certainly not a matter of common knowledge, as the court noted.  (*Id*. at p. 289, fn. 3 citing Greeley and McCready, Ethnicity, Theory and Experience (1975) Harv. Univ. Press, which presents "a view of Italian male behavior patterns exactly opposite to the prosecutor's, and based upon extensive scientific research.")

The conduct of the prosecutor in the present case bears no relationship to that of the prosecutor in *Criscione*.  As the Attorney General points out, counsel may present to the jury "matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history or literature."  (*People v. Love* (1961) 56 Cal.2d 720, 730.)  Without dwelling on the particular facts of unrelated and/or unsubstantiated cases, as in *Mendoza*, (see *Mendoza, supra*, 37 Cal.App.3d at p. 725), and without setting herself up as uniquely well-informed and an authority on the subject, the prosecutor here simply stated, *as is commonly appreciated*, that a person victimized by the criminal act of a relative, particularly a son, might well, after the passage of time, have misgivings about testifying against him.  Competent defense counsel would probably recognize not just that an objection would be overruled, but that jurors might be unnecessarily antagonized

---

[2] The fact that, like the defendant, the district attorney in *Criscione* was also Italian-American renders the situation in that case similar to that in *People v. Bain* (1971) 5 Cal.3d 839, in which an African-American prosecutor "in effect, asked the jury to give credence to his belief in defendant's guilt from the inception of the case, because he, as a black man, 'understood' black defendants.  This tactic was a way of persuading the jury that the defendant's story was a sham that could not convince any other black person."  (*Id.* at pp. 848-849, fn. omitted.)

14

by an unjustified interruption of the prosecutor's closing argument. Clearly, defense counsel's failure to object to the commonsense observation of the district attorney was not below the standard of professional competence.

## IV.

### *Defense Counsel's Failure to Request Instruction on Accident Was Not Professionally Deficient*

As previously indicated, Stoll testified that the incident resulting in the misdemeanor charge of battery against an elder in violation of section 243.25 was an "accident." She explained that when appellant kicked the stool that hit her ankle, he was not trying to hit her with the stool but simply having a "temper fit." This was consistent with appellant's testimony that he was not trying to hit her with the stool when he "kicked" it but did so because he was "irritable" due to a "conversation" or "disagreement" with his mother. Apparently relying on this testimony of Stoll and appellant, defense counsel told the jury: "[I]t should be obvious to you that this was an accident. It wasn't just the defendant said it was an accident. She said it was an accident."

Appellant maintains defense counsel was professionally deficient in failing to ask the court to request instruction with CALCRIM No. 3404, which tells the jury that defendant is not guilty of a charged crime if he or she acted "without the intent required for that crime, but acted instead accidentally."

The failure to give an instruction is harmless error if " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context . . . .' " (*People v. Wright* (2006) 40 Cal.4th 81, 98, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 721.) Although the Attorney General has not advanced the argument in these terms, that is the case here.

The jury was properly instructed that defendant was charged with battery of an elder in violation of section 243.25, and that to prove such a defendant guilty of the crime

15

the People must, among other things, prove the following things:  that "[t]he defendant willfully touched Leona Stoll in a harmful or offensive manner," that "[s]omeone commits an act willfully *when he or she does it willingly or on purpose. . . .  It is not required that he or she intend to break the law, hurt someone else, or gain any advantage,"* that "[t]he slightest touching can be enough to commit a battery if it is done in a rude or angry way," that "[m]aking contact with another person . . . is enough," and that "[t]he touching does not have to cause pain or injury of any kind," that "[t]he touching can be done indirectly by causing an object to touch the other person," *and that "[w]ords alone, no matter how offensive or exasperating, are not an excuse for this crime.*"  (Italics added.)

## CONCLUSION

In short, the jury must be deemed to have understood that it could not convict appellant of misdemeanor battery of an elder, as it did, without finding his act was purposeful—i.e., and not accidental—and that a "temper fit" was not "an excuse."

For the foregoing reasons, the judgment is affirmed.


_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Miller, J.