Filed 4/25/16  P. v. Bruno CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051427 |
| v. | (Super. Ct. No. 12ZF0147) |
| STEVEN JOSEPH BRUNO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Steven Joseph Bruno appeals from a judgment after a jury convicted him of second degree murder and found true he personally discharged a firearm causing death. Bruno argues the following: (1) the trial court made evidentiary errors; (2) the court made instructional errors; and (3) his defense counsel provided ineffective assistance of counsel. None of his contentions have merit, and we affirm the judgment.

FACTS[1]

Ernest Bruno (Ernest) and his wife Kathryn Cole adopted newborn Bruno. Four years later, Ernest and Cole adopted newborn David Bruno (David). The family lived in a home in Newport Beach (the House); Ernest had a condominium in Irvine (the Condo) he used as an office. Cole and Ernest willingly supported Bruno in the classroom and on the golf course through high school at Corona Del Mar High School, and during his first year of college at Mississippi State University (MSU) in its PGA Golf Management Program.

The parent-child relationship deteriorated after Bruno's first year at MSU when he performed poorly in his classes and Cole did not allow him to return to MSU. Things worsened when Bruno failed to enroll in community college or obtain suitable employment, and he became disrespectful and untrustworthy. Cole eventually asked

_____

[1] A number of the Attorney General's record references do not support the factual statements they claim to support. For example, she cites to page 1032 of the reporter's transcript to support the following statement, "Without a working vehicle to drive over 2,000 miles or the funds to underwrite his cross-country trip, [Bruno] knew the only route to see his lover was through . . . Ernest . . . , who possessed both the wheels and wallet necessary to facilitate his journey to the Buckeye State." Page 1032 is limited to Nnenne Edeh's testimony Bruno told her that he could not drive to see her until his vehicle, which his brother crashed, was repaired on or about August 30. A reminder to the Attorney General to *accurately* cite to the appellate record (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 9:40, p. 9-14). The statement of facts must be limited to *facts*. Editorial comments about the facts should not be stated as facts.

2

Bruno to move out of the House, and Ernest allowed Bruno to move into the Condo. About the same time, Cole and Ernest separated, and Ernest moved into the Condo. At some point, Ernest bought a Glock semiautomatic handgun (the Glock) that could fire either .40 or .22 caliber rounds. Ernest kept the Glock at the Condo.

Several months later Ernest forced Bruno to live in the garage after he discovered Bruno used his credit card without permission. Ernest would not allow Bruno to be alone in the Condo; if Ernest was not there Bruno was forced to eat and use the restroom at a nearby Del Taco.

While Bruno was living with Ernest, he met Nnenne Edeh, who lived in Toledo, Ohio, through Facebook, and they developed an online relationship. Over the next several months their relationship intensified as they communicated via the telephone and the computer. They longed to be together and twice planned for Bruno to visit her in Toledo. The second trip was cancelled when David crashed Bruno's vehicle. They planned a third trip, for August 30, 2012, when Bruno's vehicle would be repaired. He meticulously planned his route, resting points, and the motel where he would stay while visiting Edeh, who lived with her sister.

On the day Bruno was scheduled to drive to Ohio, August 30, 2012, Bruno spoke to Cole sometime that day about having breakfast the next morning for David's birthday. At 2:51 p.m., Bruno checked the availability and rate for a room at the Motel 6 in Toledo. That afternoon, David went to Ernest's house and he watched a football game with Ernest and Bruno; Ernest drank one alcoholic beverage.

Bruno texted Edeh numerous times that day regarding his departure. At 3:09 p.m., Bruno texted Edeh he was leaving, and at 8:53 p.m., he texted her that he was having dinner in Las Vegas. However, as of 9:06 p.m., Bruno had not left Irvine.

David left when the football game ended, and Ernest and Bruno remained at the Condo. What happened next is unclear. What is clear is that a couple hours later Bruno shot Ernest twice with the Glock, once in the chest and once in the forehead.

3

Bruno unloaded the Glock and tossed it in the bedroom closet. Bruno dragged Ernest into the office, grabbed credit cards, and packed Ernest's GMC Envoy (the Envoy). Bruno left to put gas in the Envoy and returned to the Condo. Bruno dragged Ernest to the doorway, packed the rest of his belongings, and tried to clean the blood on the carpet. He grabbed blankets and sheets from the garage and covered Ernest's body. Bruno wrapped Ernest's feet with plastic bags and threw his bloody eyeglasses into a trash bin on the patio. He locked the house, turned off the lights, and headed for Ohio.

The next morning, when Bruno failed to meet for breakfast, Cole sent him a text message to inquire whether he was coming. Bruno replied he was not because he was in Las Vegas and to wish David a happy birthday. Cole chastised Bruno for failing to call. Bruno sent Edeh text messages that stated he was delayed because he overslept but he was making progress.

Later that day, David drove to the Condo because he and Ernest planned to go to San Diego for his birthday. David entered the Condo and sensed something was wrong. When he opened the door between the kitchen and living room, he saw blood-soaked blankets on the floor. He called Cole who immediately drove to the Condo. When Cole and David could not open the office door, Cole called 911.

Officer Alexandria Lopez responded to the Condo. Officers used a battering ram to open the locked office door. She saw Ernest had suffered bullet wounds to his forehead and chest.

Officers searched the Condo numerous times and in the closet found the Glock, its magazine with a single .40-caliber round inside, a loose .40-caliber round, a box of .40-caliber ammunition, a .22-caliber conversion kit, and .22-caliber ammunition. Officers also found $12,000 cash in a loft area in the top of the closet. A forensic specialist found an expended bullet underneath the carpet in the office.

Later that evening, after Bruno was cited for speeding in Utah, Colorado State Trooper Brandon Baxter pulled over and arrested Bruno. Baxter took Bruno to the

4

local police station, where he was tested for gunshot residue. Law enforcement officers also conducted a vehicle search and found a wallet with $753 in cash, a laptop, an iPad, and three cellular telephones. Credit cards later showed Bruno financed his trip from Irvine to Las Vegas, through Utah, and on to Colorado with Ernest's credit cards.

Two Irvine detectives, Sean-Paul Crawford and Hurtado (we were unable to locate Hurtado's first name during our review of the record) interviewed Bruno in Colorado; the interview was recorded. Crawford advised Bruno of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. When asked if he knew why there was a warrant for his arrest, Bruno replied, "Uhm, with the - - I got a gun residue check on my hands, and now I got a defense attorney for murder. I guess somebody died." When asked whether he knew his dad was dead, he responded, "I believe so, yes." Bruno initially denied he was involved in or knew how Ernest died. After detectives questioned Bruno at length about his family, education, and home life, Hurtado asked Bruno to tell them what happened because he was not telling the truth.

Bruno stated the following. At 6:30 p.m., his bags were packed and he was ready to drive to Ohio. About 8:00 p.m., Ernest went through his bills and he became very upset and threw a "temper tantrum" because he owed someone $50,000. Bruno went into the garage with the keys to the Envoy. He did not want to be there while Ernest was angry so he began to put his bags in the Envoy. Ernest went outside and saw Bruno packing and became upset. Bruno told him he needed to leave for a while and would be back, but Ernest would not let him take the Envoy. Like he had twice before, Ernest pushed Bruno and yelled at him while Bruno walked back inside the Condo. Ernest took Bruno's belongings out of the Envoy and angrily yelled at him. Ernest continued to push and yell at him, and Bruno locked himself in the bathroom.

When Ernest went outside and continued to unload the Envoy, Bruno left the bathroom and went into the office. He grabbed the bag containing the Glock and returned to the bathroom. He loaded the Glock's magazine with three or four bullets, put

5

in the magazine, and pulled back the slide. Bruno thought about all the people he had hurt and he wanted to commit suicide, but he could not pull the trigger. When Bruno refused Ernest's pleas to come out of the bathroom, Ernest went to the kitchen. Bruno emerged from the bathroom holding the Glock. Ernest saw Bruno, told him he was "done," and charged him. Ernest was "[t]aking big steps" and was "about to throw a punch, whatever he was about to do."

Bruno shot him once in the chest and 25 seconds later, as Ernest lay on the ground, once in the forehead because "[he] couldn't stand the moaning and the screaming and the shaking." He dragged Ernest into the office "thinking that, no one would probably find him[.]" Bruno added, "[I]f I make a mistake or something, I try and hide it. I just panicked and I just moved him."

An indictment charged Bruno with murder (Pen. Code, § 187, subd. (a), all further statutory references are to the Penal Code, unless otherwise indicated) (count 1), and alleged he personally discharged a firearm causing death (§ 12022.53, subd. (d)).

*Pretrial Proceedings*

Before trial, the prosecution filed in limine motions. As relevant here, the prosecution argued the trial court should admit Ernest's autopsy photographs. The prosecution also contended the court should not permit Dr. Martha Rogers, the defense's expert, to testify regarding Bruno's specific intent at the time of the offense. In his in limine motion, Bruno asserted the trial court should allow Rogers to testify concerning Bruno's mental state at the time of the offense.

At a pretrial hearing on the in limine motions, the trial court stated its tentative ruling was to admit "some [autopsy] photographs" but the court would make that determination subject to Evidence Code section 352. The court's tentative ruling was Rogers could testify Bruno suffered from a condition, disorder, or mental illness but she could not testify any of those prevented him from formulating the required intent. When defense counsel inquired whether he could ask Rogers hypothetical questions, the

6

court stated he was "disinclined to allow hypotheticals" because that would allow Rogers to testify concerning Bruno's intent. The court ultimately deferred ruling until later in trial when it would conduct an Evidence Code section 402 hearing where Rogers would testify.

*Trial*

*Prosecution*

Bruno's interview with detectives was played for the jury. The prosecution offered testimony of numerous witnesses, including law enforcement officers, crime scene investors, forensic scientists, and Bruno's family and friends. We briefly recount some of the testimony here.

Cole testified for the prosecution concerning her family as detailed above. On recross-examination, Cole stated that on one occasion, before Bruno moved into the Condo, she saw Ernest pick up Bruno, push him against the garage wall, and yell at him. She said Ernest was six feet three inches tall and weighed 255 pounds. Cole never saw Bruno act violently towards Ernest.

There was much forensic evidence but because there is no dispute Bruno shot Ernest we need not recount it here. We do note forensic testing revealed Ernest's blood-alcohol level was .01 percent, which would cause no noticeable level of impairment. Additionally, Dr. Aruna Singhania, a forensic pathologist, testified concerning the gunshot wounds and that both gunshot wounds were fatal but Ernest could have survived for 15 minutes from the gunshot wound to the chest. When the prosecutor showed her a photograph, exhibit No. 163, she explained it depicted the bullet's exit wound on the left side of the back of Ernest's head. Pursuant to the trial court's pretrial ruling, the photograph was not published to the jury.

*Defense*

Cole testified for the defense. Cole stated she was strict and Ernest was lenient with the boys, which led to conflict and their eventual separation. Cole explained

7

that between 2008 and 2010, Ernest experienced financial problems with his business and he became moody and angry. She added that in 2010 or 2011, Ernest refused to complete family counseling because he thought it was useless. David testified that on one occasion he saw Ernest push Bruno a couple times against the wall. David never saw Bruno act violently towards Ernest. Two character witnesses testified Bruno had a reputation in the community for being peaceful.

Before the Evidence Code section 402 hearing, the trial court addressed Bruno's motion to exclude photographs of Ernest's body. At issue were two photographs: exhibit No. 95, a photograph of Ernest in the Condo depicting the forehead wound "in a vivid, graphic way[;]" and exhibit No. 163, an autopsy photograph showing the exit wound on the back of Ernest's shaved head. The court excluded exhibit No. 95 because it was cumulative to other exhibits. The court admitted exhibit No. 163 because it was the only photograph that showed the exit wound, a point defense counsel agreed. The court explained that although the photograph was "gruesome" for the average layperson, the tract of the bullet was a relevant consideration in assessing Bruno's mental state and it was more probative than prejudicial.

After an Evidence Code section 402 hearing where Rogers testified, the trial court ruled on the in limine motions as follows. The court ruled Rogers could testify that at the time of the offense Bruno suffered from a general anxiety disorder that caused him to be anxious and fearful. It also stated she could testify Bruno had diminished decision-making ability that caused him to be immature, passive, and reactive. The court said she could testify Bruno had a depressive disorder that caused him to handle pressure and stress poorly. It also said she could testify Bruno suffered from a disassociation state. Finally, it ruled she could testify concerning Bruno's feelings towards his father. The court also specified what defense counsel could not elicit from Rogers. The court ruled Rogers could not testify regarding Bruno's actual state of mind when he shot Ernest. The court added she could not testify he was in a disassociated state at the time

8

of the offense. Finally, the court ruled defense counsel could not "ask . . . Rogers questions that might mirror the facts of this case to give an opinion concerning this case and the hypothetical avatar who, in fact, is really . . . Bruno."

Rogers, a forensic neuropsychologist, interviewed Bruno and reviewed his academic, medical, and psychological treatment records and the circumstances of this case. Rogers also conducted several psychological tests on him to evaluate his cognitive and intellectual functioning and personality. Rogers determined Bruno's birth parents used drugs and alcohol and Bruno suffered from certain small birth anomalies that later resulted in low verbal skills but with family and school support he improved. She stated though he struggled at MSU when Cole was not there to support and supervise him and he suffered from anxiety. She added that when he returned home from MSU, he suffered alternately from general anxiety disorder and major depressive disorder because he feared he could not live up to his parents' expectations and he became angry when they tried to control his life. She also stated he suffered periods of being in a dissociative state. Rogers opined that at the time of the shooting, Bruno experienced depression and he "increasingly . . . perceived himself to be failing in what he thought he was supposed to be doing or what his parents thought he was supposed to be doing. Very low self-esteem and not getting anywhere."

As relevant here, the trial court instructed the jury with the following CALCRIM instructions: 500, "Homicide: General Principles"; 505, "Justifiable Homicide: Self-Defense"; 520, "First or Second Degree Murder with Malice Aforethought"; 521, "First Degree Murder"; 522, "Provocation: Effect on Degree of Murder"; 570, "Voluntary Manslaughter: Heat of Passion—Lesser Included Offense"; and 571, "Voluntary Manslaughter: Imperfect Self-Defense—Lesser Included Offense". The court also instructed the jury with CALCRIM Nos. 362, "Consciousness of Guilt: False Statements," 372, "Defendant's Flight," and 220, "Reasonable Doubt."

9

During closing argument, the prosecutor argued Bruno was guilty of first degree murder. During closing argument, defense counsel argued Bruno was depressed and anxious and he was scared of Ernest. Counsel argued Bruno's disorder was relevant to whether Bruno had the required intent and the prosecutor failed its burden of establishing beyond a reasonable doubt first degree murder. Counsel asserted Bruno acted in self-defense.

*Verdicts & Sentencing*

The jury acquitted Bruno of first degree murder but convicted him of second degree murder and found true he personally discharged a firearm causing death. The trial court sentenced Bruno to 15 years to life on count 1 and a consecutive term of 25 years for the firearm enhancement for a total prison sentence of 40 years to life.

DISCUSSION

*I. Evidentiary Claims*

*A. Hypothetical Questioning of Rogers*

Bruno argues the trial court erred by prohibiting defense counsel from asking Rogers hypothetical questions regarding his mental state at the time of the offense. We disagree.

"Although [Evidence Code] section 801 permits an expert to 'assist the trier of fact' by testifying to any subject 'that is sufficiently beyond common experience,' such testimony is limited in an important way. '[Although] opinion evidence which is otherwise admissible is not made inadmissible simply because it embraces the ultimate issue to be decided by the trier of fact . . . [t]he cited rule does not . . . authorize an "expert" to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence.' [Citations.]" (*People v. Jones* (2013) 57 Cal.4th 899, 950.)

Section 28, subdivision (a), allows defendants to introduce evidence of mental disorder to show they did not actually form a mental state required for guilt of a

10

charged crime. However, section 29 provides the following: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." We review a trial court's rulings under sections 28 and 29 for an abuse of discretion. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 663.)

In *People v. Coddington* (2000) 23 Cal.4th 529, 582 (*Coddington*), overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13, the California Supreme Court reviewed a trial court ruling that neither defendant nor the prosecutor could ask the defense psychiatric expert questions "about whether or how [defendant's possible mental] defect or disease would affect [his] mental state or actuality, or if it would impair his ability to form an intent, deliberate, or premeditate, unless the psychiatrist would testify, out of the presence of the jury, that he believed that [defendant] did not premeditate and deliberate the killings," a ruling the trial court "extended . . . to preclude any hypothetical questions regarding the effect of mental defect or illness on a person's ability to deliberate or premeditate." The *Coddington* court held the trial court's ruling "was an overly restrictive reading of the statutory limitations on admission of evidence of mental illness." (*Coddington, supra,* 23 Cal.4th at p. 582.) The court explained, "An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed [defendant] actually harbored those mental states at the time of the killing." (*Id.* at pp. 582-583.) The *Coddington* court however also stated: "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. *They preclude only expert opinion that the element*

11

*was not present.*" (*Coddington, supra,* 23 Cal.4th at p. 583, italics added; *People v. DeHoyos* (2013) 57 Cal.4th 79, 120 [reaffirming principle from *Coddington*].)

In *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1317 (*Bordelon*), defendant was charged with committing a robbery shortly after being released from prison. He presented "expert testimony on 'institutionalization,' a dependence on life in an institutional setting that made living outside the institution akin to adjusting to a new culture" (*id.* at p. 1315), and he proposed to ask the expert whether an individual in defendant's circumstances would have the intent to commit robbery. The *Bordelon* court held the trial court properly precluded defendant from asking such a hypothetical question, noting defendant "was simply planning by means of the hypothetical to do indirectly what he could not do directly under the statute, namely, elicit an opinion from [the expert] regarding defendant's specific intent . . . ." (*Id.* at p. 1327.) The court concluded: "To ask whether a hypothetical avatar in defendant's circumstances would have had the specific intent required for robbery, as counsel appeared to be proposing, would have been the functional equivalent of asking whether defendant himself had that intent. Section 29 'does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted.' [Citation.]" (*Bordelon, supra,* 162 Cal.App.4th at p. 1327.)

Here, pursuant to *Coddington* and *Bordelon*, the trial court properly prohibited defense counsel from asking Rogers hypothetical questions regarding Bruno's mental state at the time of the offense. Bruno cites to *Coddington* and its progeny, including *Bordelon*, and acknowledges his claim is contrary *Bordelon*. However, relying primarily on *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), and to some extent an earlier case, *People v. Gonzalez* (2006) 38 Cal.4th 932 (*Gonzalez*), Bruno contends the California Supreme Court blessed the use of hypothetical questions of experts in gang cases and *Vang* requires a rethinking of the *Bordelon* court's rationale and holding.

12

Unfortunately, the Attorney General does not discuss *Vang* or *Gonzalez* or address this argument. Instead, the Attorney General discusses section 29, *Coddington*, and *Bordelon* and asserts "[the trial court] had no choice but to exclude such questioning." Pursuant to *Bordelon* that is true, but Bruno questions the validity of *Bordelon* in light of *Vang*.

In *Vang, supra,* 52 Cal.4th at pages 1045-1046, the California Supreme Court held counsel may ask a gang expert hypothetical questions based on the evidence even if those questions track the evidence in a manner that is only "'thinly disguised.'" The court stated, however, a gang expert may not offer an opinion as to whether a particular defendant's actions were intended to assist or benefit a gang, or were undertaken at the direction of a criminal street gang. (*Id*. at p. 1048.) The court explained the key to determining whether the expert's opinion testimony is admissible or inadmissible is "the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves." (*Id*. at p. 1049.)

The *Vang* court addressed defendant's argument there were cases involving statutes, including *Borderlon*, that prohibited an expert from testifying on a specific topic. The court reasoned as follows: "The cases generally hold that a party may not circumvent the prohibition by using hypothetical questions. ( . . . *Bordelon*[, *supra,*] 162 Cal.App.4th [at pp.] 1326-1328 . . . .) The cases are inapposite. If a statute prohibits an expert from expressing an opinion on a point, it may be correct not to allow the expert to express that opinion by using hypothetical questions. But no statute prohibits an expert from expressing an opinion regarding whether a crime was gang related." (*Vang, supra,* 52 Cal.4th at pp. 1051-1052.)

Thus, the *Vang* court distinguished gang cases, where there is no statute prohibiting a gang expert from offering an opinion whether a crime was gang related, from cases where there is such a statute, for example section 29, prohibiting an expert from offering an opinion whether a defendant possessed a required mental state. *Vang*

13

directly addressed *Borderlon* and concluded that when a statute like section 29 prohibits expert testimony on a specific topic, a trial court may properly exclude that expert testimony. Contrary to Bruno's claim otherwise, *Vang* did not undermine *Borderlon* and it is still valid. Nothing in *Gonzalez, supra,* 38 Cal.4th at pages 946-947, a case that preceded *Vang*, alters our conclusion.

Additionally, the trial court's ruling prohibiting defense counsel from asking Rogers hypothetical questions did not violate his federal constitutional rights. (*Coddington, supra,* 23 Cal.4th at p. 583 [exclusion of expert testimony whether defendant formed required mental states did not violate federal constitutional rights].) Because we conclude the trial court did not err, we need not address whether Bruno was prejudiced. Therefore, the trial court properly prohibited defense counsel from asking Rogers hypothetical questions regarding Bruno's mental state at the time of the offense.

B. *Autopsy Photograph*

Bruno contends the trial court erred by admitting exhibit No. 163. Not so.

"The rules governing the admissibility of photographic evidence are settled: all relevant evidence is admissible, unless excluded under the federal or state Constitution or by statute, and trial courts have broad discretion in determining the relevance of evidence but lack discretion to admit irrelevant evidence. [Citation.] Photographs of a murder victim 'are always relevant to prove how the charged crime occurred, and the prosecution is "not obliged to prove these details solely from the testimony of live witnesses,"' even in the absence of a defense challenge to particular aspects of the prosecution's case. [Citations.]" (*People v. Vieira* (2005) 35 Cal.4th 264, 293.) We review the trial court's decision to allow autopsy and other photographs that may be gruesome pursuant to Evidence Code section 352 for abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 449.)

Here, the trial court exercised its discretion, balancing the probative value of exhibit No. 163 against its prejudicial effect, and properly concluded it was admissible.

14

Exhibit No. 163 was relevant because it was the only photograph that showed the exit wound on the back of Ernest's head. The photograph assisted the jury in understanding and assessing Singhania's testimony concerning the bullet's trajectory and the cause of death. This evidence was relevant to Bruno's mental state at the time of the offense because it helped the jury determine whether Bruno acted with malice or in self-defense. Contrary to Bruno's claim otherwise, exhibit No. 163 was not cumulative, it was the only photograph that showed the exit wound, a point defense counsel conceded at trial, and it corroborated Singhania's testimony.

Although the trial court described exhibit No. 163 as gruesome, the court concluded its probative value outweighed its prejudicial effect. Bruno has not transmitted exhibit No. 163 to this court for our review, and thus we are unable to assess the nature of the photograph. Nevertheless, exhibit No. 163 depicted the exit wound on the *back* of Ernest's shaved head and not his face which would tend to elicit more sympathy. Thus, the court did not err in concluding the photograph's probative value outweighed any emotional bias it would evoke against Bruno.

Bruno relies on a number of cases to argue admission of exhibit No. 163 was error because it was cumulative and unduly prejudicial. (*People v. Poggi* (1988) 45 Cal.3d 306, 323 [two photographs of murder victim irrelevant to any disputed material issue where defense counsel offered to stipulate victim was human being who was alive before attack and dead after]; *People v. Marsh* (1985) 175 Cal.App.3d 987, 997-998 [seven shocking autopsy photographs irrelevant to issues at trial; not a case where autopsy photographs relevant to prove malice]; *People v. Gibson* (1976) 56 Cal.App.3d 119, 135 [two shocking autopsy photographs not relevant where prosecutor initially argued relevant to cause of death but later used only to identify deceased]; *People v. Smith* (1973) 33 Cal.App.3d 51, 69, disapproved on other grounds in *People v. Wetmore* (1978) 22 Cal.3d 318, 324, fn. 5, 327, fn. 7 [error where three horrific photographs of victims' bodies where prosecution offered no justification for their admission].) These

15

cases are inapposite because exhibit No. 163 was relevant to Bruno's intent, not cumulative, and not unduly prejudicial.

"Because the trial court did not abuse its discretion in finding the photographs relevant and not unduly prejudicial, there was no violation of defendant's constitutional rights. [Citation.]" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 472.) Again, the trial court did not err, and we need not address Bruno's claim he was prejudiced. Thus, the trial court properly admitted exhibit No. 163.

*II. Jury Instructions*

*A. Voluntary Manslaughter Based on Excessive Force Self-Defense*

Relying primarily on *People v. Clark* (1982) 130 Cal.App.3d 371 (*Clark*), disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92, Bruno asserts the trial court erred by failing to instruct the jury sua sponte on a third theory of voluntary manslaughter—"voluntary manslaughter by use of excessive force in reasonable self-defense." Again, we disagree.

"In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] . . . [Citation.] '"'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.'"'" [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek*), overruled on other grounds in *People v. Rangel* (March 28, 2016, S076785) __ Cal.4th ___.)

Bruno cites to the following language from *Clark, supra,* 130 Cal.App.3d at page 380, to support his claim: "The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules which are applicable in this case. First, only that force which is necessary to repel an attack may be

16

used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the privilege of retaliating with deadly force.' [Citations.] Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack. [Citations.]"

Contrary to Bruno's claim otherwise, voluntary manslaughter based on use of excessive force in self-defense is not a separate theory from voluntary manslaughter based on imperfect self-defense. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 777, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) Where a person uses excessive force in self-defense, malice is negated "only if defendant honestly but unreasonably believed that the degree of force used was in fact necessary." (*Ibid.*, italics omitted.) By virtue of CALCRIM No. 571, the jury was adequately instructed on this theory, and they rejected it. In considering whether Bruno unreasonably believed he needed to use deadly force, the jury necessarily considered whether the force Bruno used was excessive, and hence unreasonable. There was no need for further instruction on excessive force. Because the trial court did not err, Bruno's federal constitutional rights were not violated. (*People v. Benavides* (2005) 35 Cal.4th 69, 100.)

*B. CALCRIM Nos. 522, 570 & 571*

Bruno argues CALCRIM Nos. 522, 570, and 571 created an impermissible presumption in favor of murder and reduced the prosecution's burden of proof. Not so.

Again, we must view the instructions as a whole and determine their correctness from the entire charge to the jury, not from a consideration of one instruction alone. (*Hajek, supra,* 58 Cal.4th at p. 1220.) Citing to portions of CALCRIM Nos. 522,

17

570, and 571, Bruno claims these instructions lightened the prosecution's burden of proof by creating an impermissible inference in favor of the prosecution on the pivotal issue of whether to reduce murder to manslaughter.

CALCRIM No. 522 stated as follows: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*) [CALCRIM No. 522 upheld]; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1335 [same].)

CALCRIM No. 570 provided in pertinent part as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. . . ." (*People v. Beltran* (2013) 56 Cal.4th 935, 954 [CALCRIM No. 570 not ambiguous]; *Jones, supra,* 223 Cal.App.4th at pp. 999-1001 [CALCRIM No. 570 upheld].)

CALCRIM No. 571 stated in relevant part as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. . . ." (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306 [CALCRIM No. 571 upheld]; *People v. Genovese* (2008) 168 Cal.App.4th 817, 832 [same].)

Contrary to Bruno's claim otherwise, there is no language in these instructions that indicates the burden of proof has shifted. In fact, CALCRIM Nos. 570 and 571 squarely place the burden on the prosecution. The last sentence of CALCRIM No. 570 states, "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

18

CALCRIM No. 571 has identical language concerning imperfect self-defense. Additionally, the trial court instructed the jury with CALCRIM No. 220, the standard reasonable doubt instruction, which stated the prosecution had the burden to prove a defendant guilty beyond a reasonable doubt.

Reading the instructions as a whole, we conclude there is no reasonable likelihood the jury misunderstood the challenged instructions to reduce the prosecution's burden of proof or impose a burden on Bruno he did not have. Thus, the trial court properly instructed the jury with CALCRIM Nos. 522, 570, and 571.

C. *CALCRIM Nos. 362 & 372*

Bruno claims CALCRIM Nos. 362 and 372 created impermissible inferences of guilt in violation of his due process rights. We disagree.

The trial court instructed the jury with CALCRIM No. 362 as follows: "If [the] defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." And the court instructed the jury with CALCRIM No. 372, "Defendant's Flight" as follows: "If the defendant fled immediately after the crime was committed that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

In *People v. Howard* (2008) 42 Cal.4th 1000, 1021 (*Howard*), the California Supreme Court rejected the contention CALCRIM No. 362, and its predecessor CALJIC No. 2.03, "invite the jury to draw irrational and impermissible inferences with regard to a defendant's state of mind at the time the offense was

committed." We are bound to follow the decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As to CALCRIM No. 372, the California Supreme Court has approved its predecessor CALJIC No. 2.52. (*People v. Carrasco* (2014) 59 Cal.4th 924, 968 [CALJIC No. 2.52 does not create unconstitutional permissive inference]; *People v. Avila* (2009) 46 Cal.4th 680, 710 [same]; *Howard, supra,* 42 Cal.4th at pp. 1020-1021 [same]; *People v. Mendoza* (2000) 24 Cal.4th 130, 179-180 [rejecting claim CALJIC No. 2.52 violates due process].) And in *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158-1159, the court of appeal rejected the argument, Bruno's argument here, there is a meaningful difference between "consciousness of guilt" in CALJIC No. 2.52 and "aware of his guilt" in CALCRIM Nos. 372. Therefore, the trial court properly instructed the jury with CALCRIM Nos. 362 and 372.

III. *Ineffective Assistance of Counsel*

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

Bruno asserts he received ineffective assistance of counsel. He states that if we conclude he forfeited the claim the trial court erred by prohibiting defense counsel from asking Rogers hypothetical questions and the court did not have a sua sponte duty to instruct on voluntary manslaughter excessive force for self-defense, his trial counsel was deficient. We have addressed both these claims and concluded Bruno's contentions are meritless. Because we conclude the trial court properly prohibited defense counsel from asking Rogers any hypothetical questions and properly instructed the jury on the

20

applicable theories of voluntary manslaughter, we need not consider Bruno's alternate claims he was deprived of effective assistance of counsel based on these alleged failures. (*People v. Jennings* (2010) 50 Cal.4th 616, 667, fn. 19.)

In any event, Bruno has not established his defense counsel was deficient. Before trial, defense counsel filed an in limine motion requesting the trial court allow him to ask Rogers hypothetical questions. Both pretrial and at the Evidence Code section 402 hearing counsel zealously represented Bruno and asserted why he should be permitted to ask Rogers hypothetical questions. And at trial, counsel elicited testimony from Rogers that Bruno suffered from various conditions and the symptoms of those conditions. With respect to the jury instruction, the failure to request a factually and legally unsupported instruction is not ineffective assistance of counsel. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

## DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

21